**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

|  |  |  |
|---|---|---|
| **INDMEX, INC.,** | § § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § § | **CASE NO. <u>1:20-cv-00727</u>** |
| **L3HARRIS TECHNOLOGIES, INC.,**<br>**Serve: Corporation Service Company, 1201**<br>**Hays Street, Tallahassee, Florida 32301** | § § § § § | |
| **Defendant.** | § § § | |

## <u>COMPLAINT</u>

COMES NOW the Plaintiff, INDMEX, INC. ("INDMEX"), by counsel, and hereby states the following in support of its Complaint against the Defendant, L3HARRIS TECHNOLOGIES, INC. ("L3Harris" or "Defendant"):

### INTRODUCTION

This case is about a small, 100% minority owned business and underdog (INDMEX) and its business being damaged vis-à-vis its elimination from an entire market as a result of illegal, tortious conduct committed by a publicly traded company (L3Harris) through the latter's use of aggressive negotiations, *quid pro quos*, and threats.  As a result, L3Harris is liable both for violations of the Sherman Antitrust Act and tortious interference with INDMEX's contracts and business expectancies.

INDMEX and L3Harris are both, *inter alia*, in the business of supporting airport operations, which includes selling and supporting certain products used by airports to monitor vehicle and aircraft locations. The tortious interference concerns INDMEX's relationship with the

producer of those products, FreeFlight Acquisition Corp. ("FreeFlight"), and INDMEX's business expectancies with airports around the United States. In short, L3Harris monopolized this market by sabotaging INDMEX's Strategic Purchase Agreement with FreeFlight (the "SPA") (and any other relationship with FreeFlight) and effectively forcing INDMEX out of the market space—in contravention to the Sherman Act.

The SPA between INDMEX and FreeFlight entitled INDMEX to purchase Automatic Dependent Surveillance-Broadcast ("ADS-B") equipment which complied with Federal Aviation Administration ("FAA") requirements.[1] As a result of the L3Harris' unlawful actions, FreeFlight terminated the SPA with INDMEX as well as a related maintenance agreement. The termination of these agreements resulted in the demise of INDMEX's proposed bids to airports for providing ADS-B equipment and related services.

In essence, L3Harris, through its tortious interference and violations of the antitrust laws, has substantially harmed INDMEX and its ability to bid on proposals to provide ADS-B equipment and related Support Services to airports around the United States. The Defendant had one purpose: to drive INDMEX out of the market and destroy its business and obtain a monopoly in that market. Through violations of the FAA procurement process, tortious interference, unlawful *quid pro quos* with FreeFlight, and violations of the Sherman Act, L3Harris achieved its end.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff INDMEX is a Virginia Corporation with its primary place of business at 13800 Coppermine Road, Herndon, Virginia 20171.

---

[1]      INDMEX has filed a separate suit against FreeFlight in the United States District Court for the Northern District of Dallas for Breach of Contract (the SPA), Breach of Warranty, and Specific Performance. Case No. 3:19-cv-01241, ECF No. 1, at 11-15. That matter has been voluntarily dismissed with prejudice by stipulation.

2.      Defendant L3Harris is a Florida Corporation with its primary place of business at 1025 W. NASA Blvd., Melbourne, Florida 32118.

3.      At all relevant times hereto, the alleged torts committed by L3Harris occurred from its Fairfax County office located at 2235 Monroe St, Reston, VA 20191 by and through its officer, Christopher Zanardi, as detailed *infra*.

4.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 as federal Courts have exclusive subject matter jurisdiction over federal antitrust claims pursuant to 28 U.S.C. §1337(a).

5.      Subject matter jurisdiction exists on the remaining claims pursuant to 28 U.S.C. § 1376 as the remaining claims are so closely related to the federal question that they form part of the same case or controversy.

6.      Pursuant to 15 USC § 15(a), jurisdiction and venue are proper in this Court.

### STATEMENT OF FACTS

<u>Background of FreeFlight, L3Harris, and INDMEX
as Air Navigation Service Providers</u>

7.      FreeFlight "designs, manufactures, sells, and supports avionics systems that improve the safety, efficiency and affordability of flying." FreeFlight Systems, *Company Overview*, www.FreeFlightSystems.com, https://www.freeflightsystems.com/company-overview/ (last visited June 5, 2020).

8.      Among those avionics systems, FreeFlight manufactures and sells Automatic Dependent Surveillance-Broadcast ("ADS-B") equipment for ground vehicles in the United States.

9.      ADS-B equipment, coupled with software, operates as a surveillance system which provides accurate, real-time tracking of surface vehicles in the airport movement area for Air Traffic Controllers, enabling increased operational safety and efficiency; this in turn gives

operations management personnel and vehicle operations situational awareness for the airport movement area. As a result, access to a ADS-B equipment (like the VMAT 1.0 or 2.0 Unit, as referenced *infra*) is often a prerequisite for bidding on safety contracts for major airport hubs like Denver, Atlanta Washington Dulles, Chicago O'Hare and Boston International Airports.

10.     According to the FAA, "[r]eal-time ADS-B is used now for air traffic control[,]" "[g]eneral aviation is safer with ADS-B traffic, weather, and flight-information services[,]" and "[s]afety and efficiency improve with advanced ADS-B applications[.]" Federal Aviation Administration, *Automatic Dependent Surveillance-Broadcast (ADS-B)*, www.FAA.gov, https://www.faa.gov/nextgen/programs/adsb/ (last visited June 5, 2020).

11.     "ADS-B improves safety and efficiency in the air and on runways, reduces costs, and lessens harmful effects on the environment." *Id*.

12.     Effect as of January 1, 2020, FAA approved ADS-B equipment is required on aircrafts to fly in and out of most airspaces in the United States. *Id*.

13.     Among those FAA approved ADS-B equipment are two (2) FreeFlight models: (1) the FDL-978-GTX/E ("VMAT 1.0")–an internal and permanent system mounted inside of the vehicle–and (2) the FDL-978-GTX/A ("VMAT 2.0") (collectively, "VMAT Units")–an external, removable system mounted outside of the vehicle. FreeFlight Systems, *978 ADS-B Ground* [*VMAT 1.0 Specifications*], www.FreeFlightSystems.com, https://www.freeflightsystems.com/wp-content/uploads/2018/07/VMAT-1.0.pdf  (last visited June 5, 2020); *see also* FreeFlight Systems, *978 ADS-B Ground* [*VMAT 2.0 Specifications*], www.FreeFlightSystems.com, https://www.freeflightsystems.com/wp-content/uploads/2018/06/VMAT-2.0.pdf (last visited June 5, 2020).

14. The VMAT 1.0 Unit was manufactured and brought to market on or about 2012 and the VMAT 2.0 Unit was manufactured and brought to market on or about late 2015.

15. The VMAT Units are primarily differentiated by their housing: VMAT 1.0 models are installed inside the cab of the vehicle and requires penetration into the roof of the host vehicle for antenna installation; by contrast, the VMAT 2.0 model is mounted to the exterior of its host vehicle though the use of a magnetic base and was designed to be less intrusive and more user-friendly.

16. As the FAA and/or airports own or lease the vehicles used by ground safety companies, they are often unwilling to have holes drilled in the roof—inhibiting the use of VMAT 1.0.

17. Vehicle location data for the vehicles equipped with the VMAT Units are fully integrated with the FAA ASDE-X and ASSC Systems as well as the National Airspace System—i.e. the navigational and surveillance technologies promulgated by the FAA to ensure seamless communication amongst vehicle operators in an airport, controllers, and other stakeholders at airports.

18. During the time of these events, the VMAT Units from FreeFlight were the only two (2) products certified by the FAA for ADS-B based ground vehicle tracking for use in United States airports. Federal Aviation Administration, *Airport Ground Vehicle Automatic Dependent Surveillance-Broadcast Out Squitter Equipment* [*Advisory Circular No. 150/5220-26*, www.FAA.gov, https://www.faa.gov/documentLibrary/media/150-5220-26-chg2.pdf (last visited June 5, 2020)

19.     At all relevant times hereto, access to the VMAT 2.0 and the ability to render additional services for the VMAT Units was a critical part of INDMEX's plan for marketing and serving its target customer list of large airports in the United States.

<u>Exelis Corp. (L3Harris's predecessor) enters into Distribution Agreement with FreeFlight</u>



20.     On January 27, 2014 ███████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████.

21.     █████████████████████████████████████████████████

████████████████████████████████████.

22.     In  2015,  █████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████.

23.     The ████████████████████████████████████████████████

██████████.

24.     In other words, ██████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████.

25.     This ███████████████████████████████████████████████

███████████████████████████████████████████████.

_____

2      The ████████████████████████████████████—who controlled 100% of the market relating to VMAT sales at major U.S. airports. Since then, Exelis was purchased by Harris Corporation who then later merged with L3 Technologies to form Defendant L3Harris. This latter acquisition happened during the relevant time period, i.e. July 2019, so all three entities will be referred to as L3Harris for ease of reference.

The SPA Between INDMEX and FreeFlight

26.     On November 10, 2015, FreeFlight and INDMEX entered into the SPA, which was subsequently renewed—without material changes—on February 5, 2018.  Attached hereto as Exhibit A is the SPA dated February 5, 2018.

27.     The purpose of the SPA was "to define the technical requirements and business provisions under which FreeFlight will provide FAA ADS-B compliant equipment to INDMEX, for use in INDMEX's systems solutions." Exh. A at 5.

28.     Specifically, the SPA permitted INDMEX to purchase VMAT 2.0.

29.     The intent of INDMEX in entering the SPA was to expand its business in the commercial aviation solutions industry utilizing the most up-to-date versions of VMATs.

30.     INDMEX expected a long-term relationship with FreeFlight, for purposes of delivering services to Airport Authorities and Air Navigation Service Providers ("ANSP"), *at least* until February 1, 2020 when the SPA was scheduled to terminate under its own terms. *Id*. at ¶ 7.1.

31.     July 25, 2016, the FAA awarded INDMEX a multiyear contract for runway incursion prevention and warning systems and certified ADS-B Vehicle Movement Area Transponders.

32.     Pursuant to the SPA, INDMEX purchased a total of fourteen (14) VMAT 2.0 Units in 2016 and promoted the same through December 2018.  These purchases were a critical part of its business growth plans.

INDMEX Becomes Authorized
Provider of Support Services for VMAT 1.0 and 2.0 Products

33.     On May 7, 2018, after the renewal of SPA with INDMEX, Pete Ring ("Ring"), FreeFlight's Vice President: (i) certified INDMEX as a "distributor" of the VMAT 2.0 Units and (ii) authorized INDMEX to perform "Level I support services" for both the **VMAT 1.0 and**

**VMAT 2.0** models (the "VMAT Support Services" and collectively, the "VMAT Support Services Certification"). Attached hereto as Exhibit B is the May 7, 2018 VMAT Support Services Certification.

34.     This certification and ability to provide VMAT Support Services – both for existing VMAT 1.0 and the newer VMAT 2.0 Units – was a key component of INDMEX's push to expand its services to major regional airports, which utilized both.

35.     INDMEX relied upon this dual authority in bidding on multiple ANSP contracts in the spring and summer of 2018.

36.     The ability of INDMEX to provide VMAT Support Services did not last.

<u>L3 Harris Interferes with</u>
<u>INDMEX's Support Services Certification</u>

37.     On July 9, 2018, Christopher Zanardi ("Zanardi"), President and General Manager of L3 Harris, acting as an officer of L3 Harris (then "Harris Corporation" or "Harris"), contacted Ring complaining about the actions of Carlos Nevarez, the President of INDMEX. Specifically, he complained that INDMEX was communicating its new VMAT Support Services Certification to prospective clients, inferring that such statements were false ███████████████████ ████████████████████████████████████████████████████████ ███████████████████████████[3]

38.     Zanardi then knowingly and falsely claimed to FreeFlight that INDMEX was barred by the ████████████████████████████████████████████—notwithstanding

---

[3] The redactions made in this Complaint are due to certain materials herein being confidential. Undersigned counsel shall move to file an unredacted version of this Complaint under seal contemporaneous to the filing of this Complaint.

the fact that ████████████████████████████████████████████████

████████████████████████████████████████.

39.     In reality, ██████████████████████████████████████████

████████████████████████████████████.

40.     Indeed, ████████████████████████████████████████████

████. For example, on July 9, 2018, ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████.

41.     In short, INDMEX was simply prevented from buying the VMAT 1.0 and selling

it ██████████████████████████.

42.     On July 23, 2018 ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████.

43.     On July 24, 2018, Zanardi ███████████████████████████████

████████████████████████████████████████████████████████████

████████████.

44.     Zanardi continued to pressure FreeFlight to terminate VMAT Support Services
Certification agreement with INDMEX, based on the false premise that Harris had an exclusive
right to provide those services.

45.     In furtherance of their violations of the antitrust laws, Zanardi and L3Harris made
false claims to both FreeFlight, Airports, and ANSPs.

46.     For example, on July 26, 2018, Zanardi ██████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
█████████████████████████████████████

47.     Notably, at this juncture, L3Harris was simply not the ███████████████
████████████████████████████████████

48.     Over the next two months, Zanardi continued to demand that FreeFlight draft a written notice terminating INDMEX's VMAT Support Services Certification.

49.     For example, on August 22, 2018, Zanardi ███████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████

50.     On that same email, Zanardi ████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████

51.     Zanardi and L3Harris anticipated a ████████████████████████ with FreeFlight for exclusivity on the support and maintenance of the VMAT Units at the expense of INDMEX and any other third-party.

52.     On August 28, 2018, Zanardi ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████

53.     On September 4, 2018, ████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

54.     On September 10, 2018, ████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

55.     On September 11, 2018 (6:01 AM), prior to providing the requested draft, ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████

56.     Later that day (at 6:06 PM), Zanardi ████████████████████████████

█████████████████████████████████████████████████████████.

---

[4] "Massport" refers to the ANSP for Logan Airport in Boston which was putting a contract out to bid in fall 2018 for ground safety solutions.

57.     As a result of the letter and because MASSPORT had made the support of the VMAT 1.0 a mandatory requirement in that procurement, MASSPORT did not receive any other bids for these services. L3Harris effectively pushed out all other competitors, not just INDMEX, from this major procurement by MASSPORT.

58.     On September 14, 2018, after repeated requests by Zanardi and L3Harris, FreeFlight finally published the requested letter (drafted by Harris), which unequivocally stated that L3Harris was the exclusive authorized provider of sales and support of the VMAT 1.0 Units. Attached hereto as Exhibit C is the September 14, 2018 letter (the "Termination Letter").

59.     In doing so, and as a direct result of Defendant's actions, FreeFlight unilaterally revoked INDMEX's status as an authorized provider of the VMAT Support Services.

60.     The Termination Letter rendered INDMEX unable to provide the VMAT Support Services necessary to pursue the bids it had *already* made to the City of Atlanta Department of Aviation and Denver International Airport, as well as services for future bids in cities like Boston or over 20 of the nation's busiest airports using the VMAT 1.0.

61.     As a result, INDMEX was eliminated from consideration as a bidder for both contracts by the ANSPs and future prospective contracts.

62.     As evidenced through the actions of Zanardi, one of L3Harris's key goal was to cut INDMEX and any other third-party off from making bids and providing RFPs to Airports and ANSPs by stating that L3Harris was the exclusive provider of the VMAT 1.0 and its corresponding services and maintenance.

63.     The sole purpose of Zanardi's contacts with FreeFlight during this time was to terminate INDMEX's service agreement with FreeFlight and, therefore, maintain the monopoly of L3Harris amongst the Airports and ANSP's and within the airport ground safety industry.

<u>L3Harris Becomes Exclusive Provider of VMAT Support Services</u>

64.     The Termination Letter was the first step of a series of actions taken by Zanardi and L3Harris to destroy and sabotage INDMEX.

65.     Once INDMEX was no longer able to provide support services, the next step was for L3Harris to sign a new Strategic Purchase Agreement with FreeFlight to exclusively provide support services going forward.

66.     In other words, FreeFlight's signing and publishing of the Termination Letter (drafted by L3Harris) was a *quid pro quo* for L3Harris entering into a new Strategic Purchase Agreement with FreeFlight which locked up the market.

67.     On January 11, 2019, ███████████████████████████████ ███████████████████████████████, whereby L3Harris would ███████████ ███████████████████████ beginning ███████████.

68.     The 2019 L3Harris SPA was intended to last through ███████████████, therefore guaranteeing ███████████████████████████████.

69.     The 2019 L3Harris SPA also finally gave L3Harris the <u>exclusive right</u> to ███████ ███████████████████████████████████████ (the "Exclusive Right").   Notably, this Exclusive Right had <u>not</u> ███████████████ ███████████████████████.

70.     By obtaining this exclusive right ███████, L3Harris excluded other vendors–like INDMEX–from bidding on Airport and ANSP contracts, which required ███████████████ ███████████.

<u>L3 Harris Actions Excluded INDMEX from<br>Bidding on 2018 Airport Proposals</u>



71.     L3Harris tortiously interfered with INDMEX's business expectancies and its ability to provide the VMAT Support Services to Airports and ANSPs.

72.     At all relevant times, L3Harris was aware of the VMAT Support Services Certification granted to INDMEX by FreeFlight.

73.     At all relevant times, L3Harris intentionally and willfully, pursued all possible measures to have INDMEX's right to the VMAT Support Services terminated.

74.     At all relevant times, L3Harris intentionally and willfully threatened FreeFlight and stated that it would no longer conduct business with FreeFlight unless FreeFlight terminated INDMEX's right to perform VMAT Support Services.

75.     As a result of L3Harris's actions, INDMEX lost out on business opportunities in connection with its right to provide VMAT Support Services.

76.     For example, on June 20, 2018, Denver International Airport published a Request for Proposal for ADS-B software and support services (the "DEN RFP")—*i.e.* the same services that INDMEX was certified to perform.

77.     On July 10, 2018, INDMEX submitted its proposal under the Denver RFP.

78.     On September 28, 2018, INDMEX was invited for a selection interview. This September 28, 2018 invitation letter is attached hereto as Exhibit D.

79.     However, on October 1, 2018, INDMEX had to inform Denver International Airport that it could no longer perform the VMAT related services in its submitted proposal, because of the Termination Letter from FreeFlight—as orchestrated by L3Harris.

80.     On November 8, 2018 Denver International Airport informed INDMEX that as a result of its inability to provides VMAT 1.0 services, it had selected another vendor for delivery of VMAT and unrelated software display and runway incursion products.

81.     Likewise, on June 6, 2018, Hartsfield-Jackson Atlanta International Airport ("ATL") published a similar Request for Proposal regarding ADS-B software and support services (the "ATL RFP").

82.     On June 17, 2018, INDMEX submitted its proposal under the ATL RFP.

83.     On September 24, 2018, ATL independently raised the issue of the Termination Letter and its relationship to INDMEX's ability to provide the VMAT Support Services.

84.     On October 1, 2018, INDMEX also informed ATL that it could no longer perform the services in its submitted proposal because of the Termination Letter from FreeFlight—as orchestrated by Defendant.

85.     Notably, L3Harris needed the Termination Letter to be issued industry-wide as soon as possible as it wanted to pursue a similar procurement request at Boston Logan International Airport – Massport ("Boston RFP").  *See supra.*

86.     INDMEX would have also pursued the Boston RFP but for L3Harris's actions in having the Termination Letter issued and circulated amongst the ANSP market.

87.     As a result of the above actions, L3Harris attempted to and was successful in excluding INDMEX from the Relevant Market (as fully defined below) and monopolizing the Relevant Market for providing VMAT Support Services to major airports and ANSP's in the United States.  This is (and was) a sub-market within the larger market of airport ground safety; the next step of L3Harris was to freeze out INDMEX from <u>any</u> access to the VMAT products.

<u>L3Harris Pressures FreeFlight to Suspend Production of VMAT 2.0
For Anti-Competitive Reasons</u>

88.     Within the Federal contracting space, sole- source contracts can be used when only one contractor is capable of delivering the goods or services needed and, therefore, it is not feasible to solicit or obtain competitive bids. *See* 2 CFR § 200.320(f).

89.     However, these types of contracts are considered high-risk and can result in wasted taxpayer resources, poor contractor results, and inadequate accountability.[5]

90.     Even after L3Harris was able to (tortiously) obtain the termination of INDMEX's right to perform VMAT Support Services, INDMEX still remained in competition with Harris through its ability to bid on contracts utilizing the VMAT 2.0 Unit—an updated alternative to Harris's exclusive distribution of the VMAT 1.0 Unit.

91.     Because there were two VMAT models in the marketplace, and because these are available through separate suppliers, Airports purchasing VMAT Units with FAA grant funds are required to go through an open and competitive procurement process.

92.     By having to undertake a competitive procurement process, this resulted in a delay in purchase orders for L3Harris (and FreeFlight) from airport procurement authorities, which "▆▆▆▆▆▆▆▆▆▆▆▆▆" for both L3Harris and FreeFlight.

93.     Therefore, L3Harris's next goal—after renewing its VMAT 1.0 supply agreement in January 2019 with FreeFlight—was to eliminate INDMEX as a competitor by terminating its underlying distributorship for VMAT 2.0 products.

94.     Prohibiting INDMEX from selling VMAT 2.0 Units would also result in L3Harris acquiring 'sole-source justification' and thus avoiding the Federal procurement process requiring competitive bids.

95.     This became the third and ultimate step in banishing INDMEX from the marketplace and consolidating a L3Harris monopoly.

---

[5]     *See, e.g.,* Office of the Inspector General's Audit Report: FAA Lacks Adequate Controls to Accurately Track and Award Sole-Source Contracts, dated May 9, 2016, at 1 (https://www.oig.dot.gov/sites/default/files/FAA%20SoleSource%20Contracts_Final%20Report%5E5-9-16.pdf).

<u>Miami Bid Protest Brings L3Harris Retaliation</u>

96.     On October 30, 2018—i.e. shortly after INDMEX lost multiple opportunities as a result of the Termination Letter and just prior to Harris entering the 2019 L3Harris SPA—Zanardi ██████████████████████████████████████████████████ "███████" █

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

97.     On October 31, 2018, Zanardi ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████

98.     In direct response to those emails, ████████████████████████

████████████████████████████████████

99.     The "██████" Zanardi was complaining of was █████████████████████

███████████████████████████████████████████████████████

████████████████████████████

100.     In response to this protest, the Dade County Procurement office, responsible for Miami International Airport, sought guidance from the FAA. That protest was supported by the FAA, as there was no showing that VMAT 2.0—*i.e.* the product INDMEX could sell—was

technically inequivalent to the VMAT 1.0 and a directly option for procurement unsuited to the task.

101.   On November 1, 2018, Zanardi 

102.   On November 3, 2018, Zanardi

    i.

    ii.

and

    iii.

"

103.          Zanardi then agreed to

Upon information and belief, they agreed on a strategy to permanently eliminate INDMEX from the VMAT market—by permanently eliminating FreeFlight's latest generation product, the VMAT 2.0 which INDMEX had access to purchase and re-sell.

<u>Under Pressure from Harris,</u>
<u>FreeFlight Stops Producing the "VMAT 2.0" Unit</u>

104.   On November 9, 2018, INDMEX's CEO Carlos Nevarez sent FreeFlight a letter regarding the performance of VMAT 2.0 Units at ATL and asking for help to "*resolve [a] technical issue*."

105.    On November 12, 2018, pursuant to the SPA, INDMEX submitted a Warranty Claim Report to Free Flight (the "Report") to fix those technical defects.

106.    On November 16, 2018, in an internal email, ███████████████████ "███████ ████████████████████████████████████████████████████████████"

107.    On November 29, FreeFlight told INDMEX it would no longer make the VMAT 2.0 Unit available unless it acquiesced to five (5) conditions, none of which were part of the SPA or otherwise required under the terms of the SPA.

108.    On December 7, 2018, prior to receiving a response from INDMEX to its November 29 letter, FreeFlight issued a letter to L3Harris, c/o Zanardi, stating ███████████ ████████████████████.

109.    On December 10, 2018, Rick Martin of L3Harris sent an email to the Miami Airport authorities regarding ██████████████████████████████████████████████████ ███████████████████████████████████. As a direct result, he asked Miami for a "████████████████████████████████" so as to ████████████████████.

110.    Word of VMAT 2.0's discontinuation spread through the market.

111.    On January 15, 2019, in response to a question from MWAA, FreeFlight stated that the "████" was being discontinued "████████████████████."

112.    On February 22, 2019, two days after directly speaking with Carlos Nevarez, CEO Taylor confirmed via letter that FreeFlight would no longer manufacture the VMAT 2.0 for INDMEX or any other distributors.  Attached hereto as Exhibit E is the February 22, 2019 letter from FreeFlight.

113.    That decision left L3Harris as the only viable option for VMAT Units (and Support Services), which were (and are) a prerequisite for bidding on airport ground safety operations.

114.    The decision to stop producing VMAT 2.0–an alternative for the VMAT 1.0–was orchestrated entirely by L3Harris in order to discourage competition so that L3Harris could enjoy the pricing benefits of "sole source" contracting.  In effect, it convinced FreeFlight to follow the plan laid out in ███████████████ from Zanardi.

115.    After the termination of the VMAT 2.0, ██████████ Zanardi ████████████ ███████ "█████" ████████████.

116.    As a result, L3Harris now has a market monopoly on both the VMAT Support Services market and the VMAT Units, thereby increasing its profitability (and increasing the cost of the U.S. taxpayer) as there is no longer a viable competitor.

117.    Even after the introduction of a new VMAT unit by a FreeFlight competitor, uAvionix Corporation, L3Harris negotiated exclusive rights to that unit as well, continuing their monopoly in the market.

118.    On March 17, 2019, Zanardi ████████████: "████████████ ████████████████████████████████████████████████████ ████████████████████████":



119.    In essence, the actions of L3Harris amounted to violations of the antitrust laws, particularly sections 1 and 2 of the Sherman Antitrust Act, as it resulted in (i) exclusive dealing, (ii) exclusionary conduct, (iii) price-fixing, (iv) rigging the FAA procurement process through an

orchestrated "sole-source" justification, (v) tying and reverse-tying, (vi) monopolization, and/or (vii) attempted monopolization.

Defendant's Tortious Interference Results
in Exclusionary Conduct

120.     L3Harris tortiously interfered with INDMEX's business expectancies and prospective business expectancies related to providing VMAT Support Services.

121.     L3Harris's motive was to drive INDMEX out of 'its' market, i.e. airport ground safety, and destroy its competition.

122.     To that end, L3Harris threatened FreeFlight with legal action, with no legal justification, unless FreeFlight terminated INDMEX's VMAT 2.0 Support Services.

123.     Upon information and belief, L3Harris threatened FreeFlight with legal action unless it also terminated the SPA and discontinued manufacturing the VMAT 2.0 Unit.

124.     Through it all, L3Harris had exclusive access to the competing—and less sophisticated—VMAT 1.0 Unit.

125.     In this manner, L3Harris became the sole source for Airport and ANSPs for providing VMAT Units and Support Services.

126.     As a result, Harris no longer had to place bids and go through the FAA's procurement process with Airports and ANSPs.

127.     By eliminating INDMEX from the market for both the VMAT Support Services and VMAT units, Defendant attempted to monopolize and/or monopolized the United States marketplace for ADS-B compliant airport ground vehicle movement area transponders (a.k.a. VMAT Units) and the servicing thereof (the "Relevant Market").

128.    By eliminating INDMEX from the market for both the VMAT Support Services and being able to sell the VMAT 2.0 Unit, Defendant engaged in illegal exclusionary conduct in violation of antitrust laws.

129.    As a result of Defendant's tortious interference and illegal conduct, Defendant sabotaged INDMEX, while attempting to monopolize and/or monopolize in the Relevant Market.

130.    The actions by Defendant were willful and wanton and taken with reckless disregard for the welfare of INDMEX.  Indeed, they were taken with the specific object of destroying INDMEX and its business relationships.

## COUNT I
### Violations of Sherman Act 15 U.S.C. § 1

131.    INDMEX hereby incorporates the paragraphs alleged above by reference as if fully alleged herein.

132.    The Sherman Act outlaws "every contract, combination, or conspiracy in restraint of trade," and any "monopolization, attempted monopolization, or conspiracy or combination to monopolize." 15 U.S.C. §§ 1, 2.

133.    "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States…" 15 U.S.C. 15(a).

134.    L3Harris's conduct violates the Sherman Act, 15 U.S.C. § 1, because L3Harris entered into an agreement, namely the 2019 L3Harris SPA, to allocate the entire Relevant Market, including the market for VMAT Units and the Support Services thereto in the United States, to L3Harris, and excluded and foreclosed competitors, including Plaintiff INDMEX, from competing in said markets.

135.    For example, L3Harris engaged in illegal exclusionary conduct by intentionally excluding INDMEX–its competitor–from the ability to compete in the Relevant Market, by (i) tortuously interfering with INDMEX's Support Services and the Certification, (ii) making false statements to FreeFlight, Airports, and ANSPs regarding INDMEX's ability to compete in said markets and provide VMAT Support Services, (iii) engaging with FreeFlight to have an exclusive agreement for the VMAT Units and their Support Services, and (iv) entering into the 2019 L3Harris SPA, thereby eliminating, excluding, and foreclosing INDMEX from the VMAT Support Services market.

136.    Further, upon information and belief, L3Harris engaged in further exclusionary conduct in that it reached a back-room deal with FreeFlight, in furtherance of entering into the 2019 L3Harris SPA, to have the VMAT 2.0 discontinued so that L3Harris could orchestrate a "sole-source" justification for its bids with Airports and ANSPs for VMAT Units and Support Services to circumvent the federal procurement guidelines, as required by 49 C.F.R., Part 18 and 2 C.F.R., Part 200, and the FAA's procurement guidelines. This in turn allowed L3Harris to make additional purchase orders from FreeFlight, without having to go through the FAA's bidding processing, and win contracts with Airports while eliminating INDMEX from being able to pursue the same. As a result of L3Harris's actions, INDMEX was also eliminated, excluded, and foreclosed from competing with L3Harris in the VMAT Units market.

137.    The aforementioned conduct by L3Harris also resulted in all bids for VMAT Units and Support Services through the FAA's procurement process with Airports being rigged in that, through the discontinuance of the VMAT 2.0 and L3Harris's false statements to Airports and ANSPs regarding INDMEX's inability to provide Support Services for the VMAT Units as a result

of L3Harris' purported exclusivity, L3Harris was able to make bids with Airports on a "sole-source" justification.  This is a *per se* violation of the antitrust laws.

138.    Further, L3Harris engaged in an illegal resale price maintenance agreement and/or illegal price-fixing in that it agreed that it would sell FreeFlight's VMAT 1.0 to "████" ████ ████ for "████████" above its cost of "████[.]" Also, this constitutes an illegal market allocation agreement in that L3Harris, being the exclusive provider of the VMAT 1.0 (with the discontinuance of the VMAT 2.0), is now allocated the entire market for the VMAT Units and Support Services without the need for FreeFlight to resort to any other third-parties, like INDMEX, to sell its VMAT Units and provide VMAT Support Services.

139.    L3Harris engaged in illegal exclusive dealing by entering into the 2019 L3Harris SPA, as alleged above, which, coupled with the discontinuance of the VMAT 2.0, granted L3Harris *exclusivity* to the VMAT Units (namely, the remaining VMAT 1.0) and Support Services. L3Harris thereafter entered into an exclusive deal with uAvionix Corporation for an exclusive right to a new VMAT unit as well, continuing their exclusive dealing in the market.

140.    L3Harris also engaged in a commercially motivated group boycott against INDMEX. L3Harris and INDMEX are horizontal competitors in the relevant markets. L3Harris has a substantial market power and horizontal control over essential resources in the Relevant Market, i.e., the VMAT Units and VMAT Support Services. As part of L3Harris's agreement and violation of the antitrust laws, L3Harris communicated with third parties that do business with INDMEX or might do business with INDMEX, and convinced them, through false statements, not to do business with INDMEX. L3Harris's conduct harmed INDMEX because INDMEX's inability to do business with third-parties, such as FreeFlight, Airports, and ANSPs, for example, makes it impossible to compete with L3Harris in the relevant markets.

141.    Additionally, L3Harris engaged in reverse-tying in that, under the 2019 L3Harris SPA and, upon information and belief, the aforementioned back-room deal to discontinue the VMAT 2.0, L3Harris agreed to purchase a set number of VMAT 1.0 from FreeFlight only on the condition that FreeFlight refuses to sell the VMAT 2.0 and refuses to grant the right to the VMAT Support Services to anyone other than L3Harris.

142.    Upon information and belief, L3Harris also engaged tying by (i) tying its VMAT 1.0 to its VMAT Support Services and vice-versa with Airports, ANSPs, and other third-party vendors, and (ii) tying the VMAT 1.0 to other ancillary services and vice-versa with Airports, ANSPs, and other third-party vendors.

143.    The requisite intent of L3Harris is illustrated by its willful acquisition of power, through their tortious conduct, which it consciously pursued, attained, and then maintained.

144.    L3Harris's conduct is a *per se* violation of Section 1 of the Sherman Act because it involves a horizontal agreement among competitors to allocate markets and exclude competitors, including Plaintiff, from the relevant product and service market.

145.    L3Harris's conduct is a *per se* violation of Section 1 of the Sherman Act because it involves price-fixing, bid-rigging, group boycotting, tying, and reverse-tying.

146.    In the alternative, L3Harris's conduct violates Section 1 of the Sherman Act under the rule of reason, or quick-look analysis.

147.    L3Harris has sufficient market and monopoly power over the Relevant Market to appreciably restraint free competition in these markets.

148.    L3Harris's conduct and agreements harm competition in the Relevant Market by excluding VMAT Unit vendors and Support Service providers, including INDMEX, from competing with L3Harris. Moreover, L3Harris's conduct and agreements discourage all VMAT Unit vendors and Support Service providers from competing within the Relevant Market.

149.    L3Harris's conduct and agreements have and will, as a result, increase prices and decrease the quality and quantity of services in the relevant markets.

150.    As a result of L3Harris's anticompetitive conduct, INDMEX has been and will continue to be injured through significant economic and financial loss, the loss of current and future business, and reputational damage. Thus, INDMEX has suffered antitrust injury from L3Harris' anticompetitive conduct, which has harmed both competition and INDMEX.

151.    L3Harris's conduct and agreements was intended to and did substantially harm and affect a substantial amount of interstate commerce.

152.    L3Harris's conduct and agreements do not qualify for immunity, nor are they reasonably related to any efficiencies or other benefits sufficient to justify their harmful effects on competition in the relevant markets. The anticompetitive harm from L3Harris's conduct and agreements substantially outweigh the non-existent efficiency and competitive benefits.

153.    As a result of L3Harris's violation of the antitrust laws, as aforementioned, INDMEX has been suffered antitrust injury and damages for an amount not less than $3,300,000.00.

154.    INDMEX is entitled to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for an amount not less than $9,900,000.00, to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, its reasonable attorneys' fees, simple interest on actual damages, and a constructive trust on any profits derived therefrom by L3Harris.

**COUNT II**
**Violations of Sherman Act 15 U.S.C. § 2**

155.    INDMEX hereby incorporates the paragraphs alleged above by reference as if fully alleged herein.

156.    L3Harris attempted to monopolize, or did actually monopolize, the Relevant Market in violation of 15 USC § 2.

157.    At all relevant times hereto, L3Harris possessed monopoly power and/or attempted to monopolize in the Relevant Market.

158.    At all relevant times hereto, L3Harris had the power to control prices and exclude competition in the Relevant Market.

159.    At all relevant times hereto, L3Harris acted with the intent to attempt to monopolize and/or monopolize in the Relevant Market.

160.    Through the cancellation of the SPA, the VMAT Support Services Certification, and L3Harris' new business arrangement with FreeFlight—i.e., the 2019 L3Harris SPA— L3Harris attempted to and were able to obtain a monopoly.

161.    At all relevant times hereto, L3Harris' intent was to attempt to monopolize and destroy and exclude INDMEX from competition in the Relevant Market so that L3Harris could attain a monopoly in the Relevant Market. In addition to the natural benefits of a monopoly (e.g. price setting), this monopoly also permitted L3Harris to bid on projects under a "sole source" justification.

162.    L3Harris's conduct and agreements have and will, as a result, increase prices and decrease the quality and quantity of services in the relevant markets.

163.    As a result of L3Harris's anticompetitive conduct, INDMEX has been and will continue to be injured through significant economic and financial loss, the loss of current and future business, and reputational damage. Thus, INDMEX has suffered antitrust injury from L3Harris' anticompetitive conduct, which has harmed both competition and INDMEX.

164.    L3Harris's conduct and agreements was intended to and did substantially harm and affect a substantial amount of interstate commerce.

165.     L3Harris's conduct and agreements do not qualify for immunity, nor are they reasonably related to any efficiencies or other benefits sufficient to justify their harmful effects on competition in the relevant markets. The anticompetitive harm from L3Harris's conduct and agreements substantially outweigh the non-existent efficiency and competitive benefits

166.     As a result of L3Harris's violation of the antitrust laws, as aforementioned, INDMEX has been suffered antitrust injury and damages for an amount not less than $3,300,000.00.

167.     INDMEX is entitled to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, or an amount not less than $9,900,000.00., to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, its reasonable attorneys' fees, simple interest on actual damages, and a constructive trust on any profits derived therefrom by L3Harris.

**COUNT III**
**Tortious Interference with Contract**

168.     INDMEX hereby incorporates the paragraphs alleged above.

169.     INDMEX had a valid contractual relationship with FreeFlight, as memorialized in the SPA and the VMAT Support Services Certification.

170.     At all relevant times, L3Harris had both actual and constructive knowledge of the contractual relationship between INDMEX and FreeFlight, as memorialized in the INDMEX SPA and the VMAT Support Services Certification.

171.     As alleged above, L3Harris intentionally interfered with the INDMEX SPA and VMAT Support Services Certification, thereby inducing and/or causing a breach and/or termination of these same contractual relationship.

172.     In furtherance of their tortious interference, L3Harris utilized several improper methods including:

i.      Making false statements about INDMEX and its contractual rights to provide VMAT Support Services;

ii.     Making false statements about its own contractual rights;

iii.    Retaliating against INDMEX for exercising its legal rights under INDMEX's SPA;

iv.     Engaging in illegal exclusionary conduct in violation of antitrust laws;

v.      Engaging in illegal exclusive dealing in violation of antitrust laws;

vi.     Engaging in illegal group boycott in violation of antitrust laws;

vii.    Engaging in illegal resale price maintenance agreement in violation of antitrust laws;

viii.   Engaging in illegal tying and reverse-tying agreement in violation of antitrust laws;

ix.     Engaging in illegal bid-rigging in violation of antitrust laws;

x.      Engaging in illegal market allocation agreement in violation of antitrust laws;

xi.     Attempting to monopolize or monopolizing in violation of antitrust laws;

xii.    Attempting to fix prices or price-fixing in violation of antitrust laws; and

xiii.   Circumventing federal procurement and FAA guidelines and rules by misrepresenting itself as an exclusive provider of VMAT Units and Support Services in order to achieve "sole-source" contracts.

173.   As a result of L3Harris's actions, INDMEX has been actually damaged for an amount not less than $3,300,000.00.

174.     L3Harris engaged in the aforementioned tortious interference against INDMEX with actual malice or wantonness, thereby entitling INDMEX to punitive damages, pursuant to Virginia Code § 8.01-38.1, for an amount not less than $350,000.00. Accordingly, INDMEX is entitled to $3,650,000.00 for its actual and punitive damages.

## COUNT IV
### Tortious Interference with Business Expectancies

175.     INDMEX hereby incorporates the paragraphs alleged above.

176.     INDMEX had a valid contractual relationship with FreeFlight, as memorialized in the SPA and the VMAT Support Services Certification.

177.     Pursuant to the VMAT Support Services Certification, INDMEX had the ability to bid on and win contracts with ANSP's and airport authorities to provide ground safety services, deploying VMAT units and providing support services for all VMAT units.

178.     At all relevant times, L3Harris had both actual and constructive knowledge of the contractual relationship between INDMEX and FreeFlight, as memorialized in the SPA and the VMAT Support Services Certification, as well as its business expectancies with ANSP's and airport authorities for airport ground services contracts.  In fact, the Defendant competed for those very same contracts.

179.     As alleged above, L3Harris intentionally interfered with the SPA and VMAT Support Services Certification, thereby inducing and/or causing a breach and/or termination of the contractual relationship between INDMEX and FreeFlight, namely the SPA and the VMAT Support Services Certification.

180.     In furtherance of their tortious interference, L3Harris utilized several improper methods including:

i.     Making false statements about INDMEX and its contractual rights to provide VMAT Support Services;

ii.     Making false statements about its own contractual rights;

iii.     Retaliating against INDMEX for exercising its legal rights under INDMEX's SPA;

iv.     Engaging in illegal exclusionary conduct in violation of antitrust laws;

v.     Engaging in illegal exclusive dealing in violation of antitrust laws;

vi.     Engaging in illegal group boycott in violation of antitrust laws;

vii.     Engaging in illegal resale price maintenance agreement in violation of antitrust laws;

viii.     Engaging in illegal tying and reverse-tying agreement in violation of antitrust laws;

ix.     Engaging in illegal bid-rigging in violation of antitrust laws;

x.     Engaging in illegal market allocation agreement in violation of antitrust laws;

xi.     Attempting to monopolize or monopolizing in violation of antitrust laws;

xii.     Attempting to fix prices or price-fixing in violation of antitrust laws; and

xiii.     Circumventing federal procurement and FAA guidelines and rules by misrepresenting itself as an exclusive provider of VMAT Units and Support Services in order to achieve "sole-source" contracts.

181.    As a result of L3Harris's actions, at a minimum, INDMEX lost out on legitimate business expectancies from no fewer than three (3) ANSP contracts in the United States, as detailed

*supra*. As a result of Defendant's actions, INDMEX was also deprived of the ability to capitalize on the supplemental services and software sought by contracting Airport Procurement Authorities.

182.    As a result of L3Harris's actions, INDMEX has been damaged for an amount not less than $3,300,000.00.

183.    L3Harris engaged in the aforementioned tortious interference against INDMEX with actual malice or wantonness, thereby entitling INDMEX to punitive damages, pursuant to Virginia Code § 8.01-38.1, for an amount not less than $350,000.00. Accordingly, INDMEX is entitled to $3,650,000.00 for its actual and punitive damages.

## Prayer for Relief

WHEREFORE, Plaintiff INDMEX prays that it be entitled to the following recovery:

- Count I – Violation of Section 1 of the Sherman Act.: actual damages in the amount of $3,300,000.00 and treble damages in an amount of $9,900,000.00 against L3Harris;

- Count II – Violation of Section 2 of the Sherman Act.: actual damages in the amount of $3,300,000.00 and treble damages in an amount of $9,900,000.00 against L3Harris.

- Count III – Tortious Interference with Contract: actual damages in the amount of $3,300,000.00 against L3Harris and punitive damages in an amount not less than $350,000.00 against L3Harris, totaling a sum of $3,650,000.00;

- Count IV – Tortious Interference with Business Expectancies: actual damages in the amount of $3,300,000.00 and punitive damages in an amount not less than $350,000.00 against L3Harris, totaling a sum of $3,650,000.00;

- Punitive damages in the amount of $350,000.00;

- ▪ Attorneys' fees, court costs, and pre- and post-judgment interest; and

- ▪ Such other relief as this Court deems just and equitable including, but not limited to, simple interest on damages pursuant to 15 U.S.C. § 15(a).

## JURY DEMAND

INDMEX, pursuant to Rule 38 of the Federal Rules of Civil Procedure, hereby demands a trial by jury on all counts herein and all the issues so triable thereto.

INDMEX, INC.
By Counsel

/s/ J. Chapman Petersen
J. Chapman Petersen, Esq., VSB #37225
David L. Amos, Esq., VSB #87271
Ibnul A. Khan, Esq., NY & MD*
CHAP PETERSEN & ASSOCIATES, PLC
3970 Chain Bridge Road
Fairfax, VA 22030
(571)-459-2510 – Direct Dial
(571)-459-2307 – Facsimile
jcp@petersenfirm.com
dla@petersenfirm.com
ik@petersenfirm.com
*Counsel for Plaintiff*

*Expected to Appear Pro Hac Vice