**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

|  |  |  |
|---|---|---|
| **INDMEX, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. <u>1:20-cv-00727</u>** |
| | § | |
| **L3HARRIS TECHNOLOGIES, INC.,** | § | |
| **Serve: Corporation Service Company, 1201** | § | |
| **Hays Street, Tallahassee, Florida 32301** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## <u>FIRST AMENDED COMPLAINT</u>

COMES NOW the Plaintiff, INDMEX, INC. ("INDMEX"), by counsel, and hereby states

the following in support of its First Amended Complaint against the Defendant, L3HARRIS

TECHNOLOGIES, INC. ("L3Harris" or "Defendant"):

### INTRODUCTION

This case is about an underdog, 100% minority owned business (INDMEX) being damaged

by its elimination from a market as a result of illegal, tortious conduct committed by a publicly

traded company (L3Harris) through the latter's use of aggressive negotiations, *quid pro quos*, and

threats. As a result, L3Harris is liable both for violations of the Sherman Antitrust Act and tortious

interference with INDMEX's contracts and business expectancies.

INDMEX and L3Harris are both, *inter alia*, in the business of supporting airport

operations, which includes selling and supporting certain products used by airports to monitor

vehicle and aircraft locations. The tortious interference concerns INDMEX's relationship with the

producer of those products, FreeFlight Acquisition Corp. ("FreeFlight"), and INDMEX's business

1

expectancies with airports around the United States. In short, L3Harris monopolized this market by sabotaging INDMEX's Strategic Purchase Agreement with FreeFlight (the "SPA") (and any other relationship with FreeFlight) and effectively forcing INDMEX out of the market space—in contravention to the Sherman Act.

The SPA between INDMEX and FreeFlight entitled INDMEX to purchase Automatic Dependent Surveillance-Broadcast ("ADS-B") equipment which complied with Federal Aviation Administration ("FAA") requirements.[1] As a result of the L3Harris' unlawful actions, FreeFlight terminated the SPA with INDMEX as well as a related maintenance agreement. The termination of these agreements resulted in the demise of INDMEX's proposed bids to airports for providing ADS-B equipment and related services.

In essence, L3Harris, through its tortious interference and violations of the antitrust laws, has substantially harmed INDMEX and its ability to bid on proposals to provide ADS-B equipment and related Support Services to airports around the United States. The Defendant had one purpose: to drive INDMEX out of the market and destroy its business and obtain a monopoly in that market. Through violations of the FAA procurement process, tortious interference, unlawful *quid pro quos* with FreeFlight, and violations of the Sherman Act, L3Harris achieved its end.

**PARTIES, JURISDICTION, AND VENUE**

1.    Plaintiff INDMEX is a Virginia Corporation with its primary place of business at 13800 Coppermine Road, Herndon, Virginia 20171.

---

[1]    INDMEX has filed a separate suit against FreeFlight in the United States District Court for the Northern District of Dallas for Breach of Contract (the SPA), Breach of Warranty, and Specific Performance. Case No. 3:19-cv-01241, ECF No. 1, at 11-15. That matter has been voluntarily dismissed with prejudice by stipulation.

2.      Defendant L3Harris is a Florida Corporation with its primary place of business at 1025 W. NASA Blvd., Melbourne, Florida 32118.

3.      At all relevant times hereto, the alleged torts committed by L3Harris occurred from its Fairfax County office located at 2235 Monroe St, Reston, VA 20191 by and through its officer, Christopher Zanardi, as detailed *infra*.

4.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 as federal Courts have exclusive subject matter jurisdiction over federal antitrust claims pursuant to 28 U.S.C. §1337(a).

5.      Subject matter jurisdiction exists on the remaining claims pursuant to 28 U.S.C. § 1376 as the remaining claims are so closely related to the federal question that they form part of the same case or controversy.

6.      Pursuant to 15 USC § 15(a), jurisdiction and venue are proper in this Court.

## STATEMENT OF FACTS

I.      **The Relevant Market**.

    A.      **The Product Market**.

        i.      **ADS-B equipment for ground vehicles**.

7.      Due to incidents and accidents involving aircraft and vehicles at airports, many of which occur in periods of reduced visibility that can result in a loss of situational awareness for flight crews and air traffic controllers, the FAA is in the process of deploying several systems and technologies–like ADS-B–to help reduce the number and severity of these incidents. Federal Aviation Administration, *Airport Ground Vehicle Automatic Dependent Surveillance-Broadcast Out Squitter Equipment* [*Advisory Circular No. 150/5220-26 Change 1-2*], www.FAA.gov, https://www.faa.gov/documentLibrary/media/150-5220-26-chg2.pdf (last visited August 18,

2020) ("FAA AC 150/5220-26"), at 2. The FAA Advisory Circular 150/5220-26 is attached hereto as Exhibit A.

8.      ADS-B is a cornerstone technology in the FAA's Next Generation Air Transportation System ("NextGen") initiative to modernize the safety, efficiency, and capacity of the National Airspace System. Exh. A at 2.

9.      "ADS-B will provide improved surveillance in the terminal, en route, and on surface environments, and will provide equipped aircraft with shared situational awareness via a cockpit display of proximate traffic. In order to achieve the benefits of ADS-B on the airport surface, surface vehicles and aircraft should be equipped with the ability to transmit ADS-B messages." *Id*.

10.     "At airports with no surface surveillance, ADS-B can serve as a means to improve situational awareness for both air traffic control and aircraft operators equipped with the ability to receive and display ADS-B messages. This capability provides for a high level of safety. The inclusion of airport vehicles into the surface surveillance picture gives air traffic controllers and operators one more way to identify traffic issues, understand the most efficient way to proceed on the airport surface, and avoid incursions." *Id.* at 2-3.

11.     ADS-B equipment, coupled with software, operates as a surveillance system which provides accurate, real-time tracking of surface vehicles in the airport movement area for Air Traffic Controllers, enabling increased operational safety and efficiency; this in turn gives operations management personnel and vehicle operations situational awareness for the airport movement area. As a result, access to ADS-B equipment (like the VMAT 1.0 or 2.0 Unit, as referenced *infra*) is often a prerequisite for bidding on contracts for this and other technology at

major airport hubs like Denver, Atlanta Washington Dulles, Chicago O'Hare and Boston International Airports.

12.     According to the FAA, "[r]eal-time ADS-B is used now for air traffic control[,]" "[g]eneral aviation is safer with ADS-B traffic, weather, and flight-information services[,]" and "[s]afety and efficiency improve with advanced ADS-B applications[.]" Federal Aviation Administration, *Automatic Dependent Surveillance-Broadcast (ADS-B)*, www.FAA.gov, https://www.faa.gov/nextgen/programs/adsb/ (last visited June 5, 2020).

13.     "ADS-B improves safety and efficiency in the air and on runways, reduces costs, and lessens harmful effects on the environment." *Id*.

14.     FAA AC 150/5220-26 "provides guidance on the development, installation, testing, approval, and maintenance of Automatic Dependent Surveillance – Broadcast (ADS-B) Out squitter units for airport ground vehicles." Exh. A at 1, § 1.

15.     Using FAA AC 150/5220-26, "airports will be able to acquire approved and authorized airport ground vehicle ADS-B squitter units that are compliant with Title 14 Code of Federal Regulations (CFR), Part 91, Automatic Dependent Surveillance-Broadcast (ADS–B) Out Performance Requirements to Support Air Traffic Control (ATC) Service, as well as the initial set of ADS-B applications." *Id*.

16.     The "technical specifications for manufacturing ADS-B squitter units for airport ground vehicles are published in the FAA's document, FAA-E-3032, Vehicle Automatic Dependent Surveillance – Broadcast (ADS_B) Specification, published January 7, 2015." *Id*.

17.     "All airport ground vehicle ADS-B squitter units must meet the requirements stated in FAA-E-3032, Airport Ground Vehicle ADS-B Specification, January 7, 2015." *Id*., at § 2, ¶ a.

18.     The use of the FAA AC 150/5220-26 "is mandatory for all Part 139 certificated airports using this equipment, as well as projects funded with federal grant monies through the Airport Improvement Program (AIP) and with revenue from the Passenger Facility Charge (PFC) Program. See Grant Assurance No. 34, Policies, Standards, and Specifications, and PFC Assurance No.9, Standards and Specifications." *Id.*, at ¶ c.

19.     "ADS-B squitter units must meet the technical specifications" of the FAA AC 150/5220-26. *Id.*, at 2, ¶ e.

20.     "The primary locations for installation of ADS-B squitters on vehicles are the 35 airports equipped with ADSE-X and the nine airports scheduled to receive ASSC upgrades to their ADSE-3 systems." *Id.*, at 2, ¶ f; *see also id.* at 6-7 (list of ASDE-X[2] equipped airports and airports to be equipped with ASSC).

21.     "At airports already equipped with surface surveillance, such as Airport Surface Detection Equipment – Model X (ASDE-X), ADS-B will provide pilots with improved communication with air traffic control and efficiency of operations. ASDE-X information is fed into the Traffic Information Service-Broadcast (TIS-B) service and could provide pilots with a complete surface picture. This situational awareness can be employed to provide supplemental

---

[2]     "Airport Surface Detection System — Model X (ASDE-X) is a surveillance system using radar, multilateration and satellite technology that allows air traffic controllers to track surface movement of aircraft and vehicles. It was developed to help reduce critical Category A and B runway incursions." Federal Aviation Administration, *Airport Surface Detection System — Model X (ASDE-X),* www.FAA.gov, https://www.faa.gov/air_traffic/technology/asde-x/ (last visited August 18, 2020). "The ASDE-X alerts air traffic controllers of potential runway conflicts by providing detailed coverage of movement on runways and taxiways. By collecting data from a variety of sensors, ASDE-X is able to track non-transponder equipped and transponder equipped vehicles and aircraft on the airport movement area." *Id.*

benefits to existing surface surveillance and provide an additional resource for future applications of ADS-B in the surface environment." *Id.* at 3.

>        ii.        **VMAT 1.0 and VMAT 2.0 Units**.

22.     FreeFlight "designs, manufactures, sells, and supports avionics systems that improve the safety, efficiency and affordability of flying." FreeFlight Systems, *Company Overview*, www.FreeFlightSystems.com, https://www.freeflightsystems.com/company-overview/ (last visited June 5, 2020).

23.     Among those avionics systems, FreeFlight manufactures and sells ADS-B equipment for ground vehicles in the United States.

24.     Among those FAA approved ADS-B equipment are two (2) VMAT models by FreeFlight: (1) the FDL-978-GTX/E ("VMAT 1.0")–an internal and permanent system mounted inside of the vehicle–and (2) the FDL-978-GTX/A ("VMAT 2.0")–an external, removable system mounted outside of the vehicle (collectively, "VMAT Units"). FreeFlight Systems, *978 ADS-B Ground* [*VMAT 1.0 Specifications*], www.FreeFlightSystems.com, https://www.freeflightsystems.com/wp-content/uploads/2018/07/VMAT-1.0.pdf (last visited June 5, 2020); *see also* FreeFlight Systems, *978 ADS-B Ground* [*VMAT 2.0 Specifications*], www.FreeFlightSystems.com, https://www.freeflightsystems.com/wp-content/uploads/2018/06/VMAT-2.0.pdf (last visited June 5, 2020). FreeFlight's aforementioned specification pages regarding the VMAT 1.0 and VMAT 2.0 are respectively attached hereto as Exhibits B and C.

25.     The VMAT 1.0 Unit was manufactured and brought to market on or about May 2012 and the VMAT 2.0 Unit was manufactured and brought to market on or about May 2016.

26.     The VMAT Units are primarily differentiated by their housing: VMAT 1.0 models are installed inside the cab of the vehicle and requires penetration into the roof of the host vehicle for antenna installation; by contrast, the VMAT 2.0 model is mounted to the exterior of its host vehicle though the use of a magnetic base and was designed to be less intrusive and more user-friendly.

27.     As the FAA and/or airports own or lease the vehicles used by ground safety companies, they are often unwilling to have holes drilled in the roof—inhibiting the use of VMAT 1.0.

28.     Vehicle location data for the vehicles equipped with the VMAT Units are fully integrated with the FAA ASDE-X and ASSC Systems as well as the National Airspace System—i.e. the navigational and surveillance technologies promulgated by the FAA to ensure seamless communication amongst vehicle operators in an airport, controllers, and other stakeholders at airports.

29.     The VMAT 1.0 appeared as follows, with the following specifications, certifications, and physical characteristics:



## ADS-B GROUND

| SPECIFICATIONS | |
| --- | --- |
| Model | FDL-978-GTX/E |
| Equipment Type | Ground Vehicle Universal Access Transceiever (UAT) |
| Link Frequency | 978 MHz |
| Transmitter Power | 20 watts max at antenna |
| Transmit Antenna | UAT/DME antenna TSO-C66c, TSO-C74c, TSO-C112 compliant |
| GPS/SBAS Antenna | TSO-C190 & TSO-C144 compliant |
| On-Board Map Storage | Multi-Polygon, 6,000 points max |
| Power | 10-40 VDC, Typical 0.14 A @ 28 VDC |
| CERTIFICATIONS | |
| TSO Compliance (Designed to meet) | TSO-C154c (B2) TSO-C145c (Beta 1) |
| Environmental | DO-160G |
| Software | RTCA/DO-178B Level C |
| PHYSICAL CHARACTERISTICS | |
| Size | 1.8" H 5.1" W 5.8" D |
| Weight | 1.1 lbs |
| Operating Temperature | -40°C to +70°C |

*FreeFlight Systems is the sole-source provider of ADS-B equipment for airport ground vehicles per the FAA's Advisory Circular 50/5220-26 Change 1*

Exh. B at 2.

30.     The VMAT 1.0 "includes an ADS-B aviation-certified internal WAAS/GPS sensor that provides the ability to collect position, velocity, time and other vehicle state information. The system transmits data from the airport ground vehicle to air traffic and ground control once per second, allowing positive identification of the vehicle. The system utilizes robust Universal Access Transceiver (UAT) technology, and is fully compatible with ASDE-X and multilateration systems, ensuring seamless integration with existing traffic control support systems." *Id*.

31.     "Utilizing an internally stored map of the airport control area, the system can be configured to either transmit or cease transmission of vehicle information when located in specified areas. Support and maintenance is managed via the USB port and an easy-to-use PC application that can be hosted on a laptop." *Id*.

32.     The VMAT 2.0 appeared as follows, with the following specifications, certifications, and physical characteristics:



## ADS-B GROUND

| SPECIFICATIONS | |
|---|---|
| Model | FDL-978-GTX/A |
| Equipment Type | Ground Vehicle Universal Access Transceiver (UAT) |
| Link Frequency | 978 MHz |
| Transmitter Power | 20 watts max at antenna |
| Transmit Antenna | UAT/DME antenna TSO-C66c, TSO-C74c, TSO-C112 compliant |
| GPS/SBAS Antenna | TSO-C114 compliant |
| On-Board Map Storage | Multi-Polygon, 6,000 points max |
| Power | 10-40 VDC, Typical 0.3 A @ VDC |
| **CERTIFICATIONS** | |
| TSO Compliance (Designed to meet) | TSO-C154c (A1S) TSO-C157a (Class 1) TSO-C195b (Class C1) TSO-C145c (Beta 1) |
| Environmental | DO-160G |
| Software | RTCA/DO-178B Level C |
| Hardware | RTCA/DO-254 Level C |
| **PHYSICAL CHARACTERISTICS** | |
| Size | 7.8" H 8" W 13.1" D |
| Weight | 3.6 lbs |
| Operating Temperature | -40°F to 158°F |

*System is compliant in accordance with AC 50/5220-26 Change 1*

Exh. C at 2.

33. The VMAT 2.0 "aviation-certified internal WAAS/GPS sensor provides the ability to collect position, velocity, time and other vehicle state information. The system transmits data from the airport ground vehicle to air traffic and ground control once per second, allowing positive identification of the vehicle. The system utilizes robust Universal Access Transceiver (UAT) technology, and is fully compatible with ASDE-X and multilateration systems, ensuring seamless integration with existing traffic control support systems." *Id.*

34.     "Utilizing an internally stored map of the airport control area, the system can be configured to either transmit or cease transmission of vehicle information when located in specified areas. Support and maintenance is managed via an easy-to-use Android tablet application." *Id*.

35.     "The system is externally mounted, no drilling holes or antenna mounts required, and can be easily swapped out without the need for installation changes." *Id*.

36.     Notably, the VMAT Units operate at 978 MHz frequency. Exh. B at 2; Exh. C at 2.

37.     The VMAT Units were specifically ADS-B-Out systems as opposed to ADS-B-In systems.[3] *See* Federal Aviation Administration, *FAA Certified Equipment* [current as of August 7, 2020], www.FAA.gov, https://www.faa.gov/nextgen/equipadsb/installation/equipment/_-_v2V (last visited August 19, 2020) (listing the VMAT 1.0 and VMAT 2.0 as the only "FAA-Approved V2 ADS-B-Out for Vehicles").

---

[3]     "ADS-B Out works by broadcasting information about an aircraft's GPS location, altitude, ground speed and other data to ground stations and other aircraft, once per second. Air traffic controllers and aircraft equipped with ADS-B In can immediately receive this information. This offers more precise tracking of aircraft compared to radar technology, which sweeps for position information every 5 to 12 seconds.

Radio waves are limited to line of site meaning radar signals cannot travel long distances or penetrate mountains and other solid objects. ADS-B ground stations are smaller and more adaptable than radar towers and can be placed in locations not possible with radar. With ground stations in place throughout the country, even in hard to reach areas, ADS-B provides better visibility regardless of the terrain or other obstacles…

ADS-B In provides operators of properly equipped aircraft with weather and traffic position information delivered directly to the cockpit. ADS-B In-equipped aircraft have access to the graphical weather displays in the cockpit as well as text-based advisories, including Notices to Airmen and significant weather activity." Federal Aviation Administration, *Ins and Outs* [*of ADS-B systems*], www.FAA.gov, https://www.faa.gov/nextgen/equipadsb/capabilities/ins_outs/ (last visited August 19, 2020) (describing the difference between ADS-B-Ins and Outs)).

38.     "Airport authorities or entities approved by the FAA to use Ground Vehicle ADS-B Out Squitter Equipment are required to obtain a license to transmit prior to operating." Exh. A at 10; *see also* 47 C.F.R., Part 87 (governing the licensing and operation of equipment transmitting within aviation frequency bands).

39.     "Application for a transmit license can be filed through the FCC's Universal Licensing System (ULS)." Exh. A at 10.

40.     "Prior to filing with the FCC, the applicant is required to coordinate with the applicable FAA Regional Frequency Management Office (FMO)." Exh. A at 11.

41.     "Airport authorities or entities approved by the FAA can apply to operate up to 200 vehicle squitters under a single application." Exh. A at 10. This is to "ensure the performance of other FAA surveillance systems operating on the 1090 MHz frequency is not degraded." *Id*. at 11.

42.     "Vehicles equipped with the airport ground vehicle ADS-B squitter units must meet the requirements outlined in FAA-E-3032, Airport Ground Vehicle ADS-B Specification, January 7, 2015." *Id*.

43.     "The operation of aircraft ground vehicle ADS-B squitter units is confined to the airport movement area. For vehicles equipped with 978 MHz UAT squitter units, this includes operations in transit to the movement area. Use of the proper Squitter Transmit Map will ensure compliance with this requirement." *Id*.

44.     During the time of these events, the VMAT Units from FreeFlight were the only two (2) products certified by the FAA for ADS-B based ground vehicle tracking for use in United States airports. Federal Aviation Administration, *Airport Ground Vehicle Automatic Dependent Surveillance-Broadcast Out Squitter Equipment* [current as of August 7, 2020] [*Advisory Circular No.        150/5220-26        Changes        1-2*],        www.FAA.gov,

https://www.faa.gov/documentLibrary/media/150-5220-26-chg2.pdf (last visited August 19, 2020).

45.     At the relevant time of the alleged events, the VMAT Units had no reasonable substitutes because they were the only available FAA-certified ADS-B products on the market for ground vehicles. Exh. A at 15; *see also* Federal Aviation Administration, *FAA Certified Equipment* [current as of August 7, 2020], www.FAA.gov, https://www.faa.gov/nextgen/equipadsb/installation/equipment/ - v2V (last visited August 19, 2020) (listing the VMAT 1.0 and VMAT 2.0 as the only "FAA-Approved V2 ADS-B-Out for Vehicles").

46.     Further, those products that are FAA-certified like the "ADS-B-Out Avionics" and "ADS-B-In Avionics[,]" *see* Federal Aviation Administration, *FAA Certified Equipment* [current as of August 7, 2020], www.FAA.gov, https://www.faa.gov/nextgen/equipadsb/installation/equipment/ - v2V (last visited August 19, 2020) (listing the FAA-Approved ADS-B systems), are not substitutable alternatives for the VMAT Units, as the  "ADS-B-Out Avionics" and "ADS-B-In Avionics" products are only approved by the FAA to be used on aircrafts as opposed to ground vehicles. *See* 14 C.F.R. 91.225; 14 C.F.R. 91.227; *see also* 84 F.R. 12062 (FAA's policy statement for air traffic control (ATC) authorizations to persons seeking to operate aircraft that are not equipped with Automatic Dependent Surveillance-Broadcast (ADS-B) Out equipment in ADS-B airspace after January 1, 2020.).

47.     A separate Advisory Circular applies to the use and operation of "ADS-B-Out Avionics" and "ADS-B-In Avionics." *see* Federal Aviation Administration, *Advisory Circular No. 90-114B*, www.FAA.gov,

https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_90-114B.pdf   (last   visited

August 19, 2020).

48.     The "ADS-B-Out Avionics" and "ADS-B-In Avionics" are independent goods than

that of the VMAT Units and are part of a wholly separate market such that if the price of the "ADS-

B-Out Avionics" and "ADS-B-In Avionics" products were to increase, the demand for the VMAT

Units would remain unchanged.

49.     Therefore, no such interchangeable products exist except for the VMAT 1.0 and

VMAT 2.0, which consumers–*e.g.* airport authorities or entities–may substitute for one another.

### iii.     Support Services for the VMAT Units.

50.     "The ***vendor-supplied user interface software*** will upload an airport ground

vehicle ADS-B squitter transmit map for the airport surface to the airport ground vehicle ADS-B

unit. The FAA must supply the vendor and airport with the current squitter transmit map for the

airport surface in a .kml format from which the vehicle squitter transmit map for the airport surface

should be created and uploaded to the airport ground vehicle ADS-B unit. The squitter transmit

map for the airport surface must be used to control the airport ground vehicle ADS-B squitter

on/off function of the vehicle unit." *Id*. at 12 (emphasis added).

51.     Accordingly, vendors who sold VMAT Units directly to airports authorities or

entities also were authorized to provide airport authorities or entities with the vendor's own user-

interface software[4] for the operation of the VMAT Units, services for removing, replacing, and

troubleshooting   the   VMAT   Units,   running   diagnostics,   and   providing   technical   support   for

---

[4]       Part of the user-interface software includes airport surface flight management system,
which allows the airport authority or entity to determine the location of their ground vehicles via
a control display unit.

firmware and map updates for the VMAT Units (collectively, the "Support Services"), which the airport authorities or entities could purchase together with the VMAT Units or separately.

52.     Companies providing Support Services are limited by commercial realities, as further discussed herein, and airport authorities or entities seek a vendor who is authorized to provide both the VMAT Units and the Support Services, like L3Harris.

53.     Accordingly, INDMEX, L3Harris, and, upon information and belief, Team Eagle Ltd. ("Team Eagle") were the only vendors who had contracts with FreeFlight to provide VMAT Units and Support Services to airport authorities or entities in the United States.

54.     At the relevant times of the alleged events, only INDMEX, L3Harris and, upon information and belief, Team Eagle were engaged in the business of supplying VMAT Units and the Support Services to airport authorities or entities in the United States.

55.     FreeFlight granted L3Harris an exclusive right to purchase the VMAT 1.0 and a non-exclusive right to L3Harris, INDMEX, and Team Eagle the right to purchase the VMAT 2.0.

56.     FreeFlight granted L3Harris and INDMEX the right to provide Support Services for both VMAT Units until it later revoked INDMEX's right and made L3Harris the exclusive Supper Services provider for the VMAT 2.0.

57.     At all relevant times hereto, access to the VMAT 2.0 and the Support Services thereto was a critical part of INDMEX's plan for marketing and serving its target customer list of large airports in the United States.

**B.     The Geographic Market**.

58.     While the primary locations for the area of effective competition for the VMAT Units and Support Services are the 44 airports shown the FAA AC 150/5220-26, *see* Exhibit A at

6-7,  the FAA AC 150/5220-26 does not preclude other airports from seeking to obtain a license from the FAA and equip their ground vehicles with the VMAT Units. *See, e.g.,* Exh. A at 10-11.

59.     Further, the use of the FAA AC 150/5220-26 "is mandatory for all Part 139 certificated airports using this equipment [*i.e.*, VMAT Units], as well as projects funded with federal grant monies through the Airport Improvement Program (AIP)…" Exh. A at 1. A list of the FAA Part 139 certificated airports is attached hereto as Exhibit D.

60.     Certified under Part 139 is a total of 521 airports around the United States and its territories. *See generally* Exh. D.

61.     INDMEX and L3Harris viewed themselves as competing to supply VMAT Units to airport authorities or entities in or around the United States and, specifically, to those 44 airports listed in the FAA AC 150/5220-26 and the 521 airports certified under Part 139.

62.     INDMEX and L3Harris marketed the VMAT Units–respectively, the VMAT 2.0 and VMAT 1.0–to airport authorities or entities in the United States.

63.     Airport authorities or entities–the consumers here–in the United States were able to turn to INDMEX and L3Harris to provide VMAT Units and Support Services by seeking requests for proposals for bids under the FAA procurement guidelines.

64.     Given the commercial realities, the geographic market consists of the entire United States.

65.     Therefore, the relevant market is confined to all VMAT Units and the Support Services thereto in the United States.

**II.    L3HARRIS AND INDMEX ENTER THE RELEVANT MARKET BY CONTRACTING WITH FREEFLIGHT FOR THE VMAT UNITS AND SUPPORT SERVICES**.

**A.    Exelis Corp. (L3Harris's predecessor) enters into Distribution Agreement with FreeFlight**.

66.     On January 27, 2014, a predecessor[5] to L3Harris, Exelis Corporation ("Exelis"), entered into a Strategic Purchase Agreement with FreeFlight (the "2014 Exelis SPA") for the purpose of purchasing the VMAT 1.0.

67.     The 2014 Exelis SPA was for one (1) year, with an option to renew, and required Exelis to sell a certain number of units per quarter as a distributor.

68.     In 2015, Exelis entered into a revised Strategic Purchase Agreement with FreeFlight (the "2015 Exelis SPA"), which extended the right to purchase the VMAT 1.0 units, set new prices, and specifically identified the component parts of VMAT 1.0, which Exelis could sell.  No support agreement was referenced.

69.     The 2015 Exelis SPA granted Exelis exclusivity rights *only* regarding the *purchase* of VMAT 1.0.

70.     In other words, Exelis had no exclusivity as to service or maintenance of the VMAT 1.0. Neither were they any references or restrictions regarding VMAT 2.0 Units, which did not even exist at the time.

71.     This 2015 Exelis SPA expired on December 31, 2017. After is expiration, no formal agreement was in place between FreeFlight and L3Harris until January 11, 2019.

**B.      The SPA Between INDMEX and FreeFlight.**

---

[5]     The 2014 L3Harris SPA was originally entered into by Exelis—who controlled 100% of the market relating to VMAT sales at major U.S. airports. Since then, Exelis was purchased by Harris Corporation who then later merged with L3 Technologies to form Defendant L3Harris. This latter acquisition happened during the relevant time period, i.e. July 2019, so all three entities will be referred to as L3Harris for ease of reference.

72.     On November 10, 2015, FreeFlight and INDMEX entered into the SPA, which was subsequently renewed—without material changes—on February 5, 2018.  Attached hereto as Exhibit E is the SPA dated February 5, 2018.

73.     The purpose of the SPA was "to define the technical requirements and business provisions under which FreeFlight will provide FAA ADS-B compliant equipment to INDMEX, for use in INDMEX's systems solutions." Exh. E at 5.

74.     Specifically, the SPA permitted INDMEX to purchase VMAT 2.0.

75.     The intent of INDMEX in entering the SPA was to expand its business in the commercial aviation solutions industry utilizing the most up-to-date versions of VMATs.

76.     INDMEX expected a long-term relationship with FreeFlight, for purposes of delivering services to Airport Authorities and Air Navigation Service Providers ("ANSP"), *at least* until February 1, 2020 when the SPA was scheduled to terminate under its own terms. *Id*. at ¶ 7.1.

77.     July 25, 2016, the FAA awarded INDMEX a multiyear contract for runway incursion prevention and warning systems and certified ADS-B Vehicle Movement Area Transponders.

78.     Pursuant to the SPA, INDMEX purchased a total of fourteen (14) VMAT 2.0 Units in 2016 and promoted the same through December 2018.  These purchases were a critical part of its business growth plans.

        **C.     INDMEX Becomes Authorized Provider of Support Services for VMAT 1.0 and 2.0 Products**.

79.     On May 7, 2018, after the renewal of SPA with INDMEX, Pete Ring ("Ring"), FreeFlight's Vice President: (i) certified INDMEX as a "distributor" of the VMAT 2.0 Units and (ii) authorized INDMEX to perform "Level I support services" for both the **VMAT 1.0 and VMAT 2.0** models (the "VMAT Support Services" and collectively, the "VMAT Support Services

Certification"). Attached hereto as Exhibit F is the May 7, 2018 VMAT Support Services Certification.

80.     This certification and ability to provide VMAT Support Services – both for existing VMAT 1.0 and the newer VMAT 2.0 Units – was a key component of INDMEX's push to expand its services to major regional airports, which utilized both.

81.     INDMEX relied upon this dual authority in bidding on multiple ANSP contracts in the spring and summer of 2018.

82.     The ability of INDMEX to provide VMAT Support Services did not last.

III.    **L3HARRIS ENGAGES IN TORTIOUS CONDUCT AND ANTICOMPETITIVE BEHAVIOR IN VIOLATION OF THE ANTITRUST LAWS TO DESTROY INDMEX AND LIKE COMPETITORS IN THE RELEVANT MARKET**.

A.    **L3Harris Interferes with INDMEX's Support Services Certification.**

83.     On July 9, 2018, Christopher Zanardi ("Zanardi"), President and General Manager of L3 Harris, acting as an officer of L3 Harris (then "Harris Corporation" or "Harris"), contacted Ring complaining about the actions of Carlos Nevarez, the President of INDMEX. Specifically, he complained that INDMEX was communicating its new VMAT Support Services Certification to prospective clients, inferring that such statements were false :  "*Carlos seems to be claiming that that INDMEX is now certified to provide VMAT 1.0 hardware repair and support services to units we [Harris] have deployed in the field*."[6]

84.     Zanardi then knowingly and falsely claimed to FreeFlight that INDMEX was barred by the 2015 Exelis SPA from providing support services for VMAT 1.0 units—notwithstanding

---

[6]     While the quotes are not italicized in their original form, they are italicized here for ease of reading.

the fact that the 2015 Exelis SPA had already expired as of December 2017 and without any other operating agreement in place between FreeFlight and L3Harris.

85.     In reality, even if the 2015 Exelis SPA was still timely, that agreement had never provided exclusivity for VMAT Support Services.

86.     Indeed, FreeFlight made it clear to L3Harris that L3Harris had no such exclusive right. For example, on July 9, 2018, Ring emailed Zanardi stating: "… *there is no current SPA in place between Harris and FreeFlight Systems. Section 5.5 screen shots below [from the 2015 Exelis SPA] precluding us from offering sale of products to those original Harris clients which we are in compliance with. INDMEX is providing service and repair. In accordance with the old SPA INDMEX is not permitted to sell product to those customers*."

87.     In short, INDMEX was simply prevented from buying the VMAT 1.0 and selling it under the 2015 Exelis SPA.

88.     On July 23, 2018 FreeFlight via Ring sent an email to Zanardi stating: "*If we could find a way to secure a longer term commitment via an agreement or P.O. we would absolutely terminate the service arrange with Carlos on the VMAT 1.0 immediately*."

89.     On July 24, 2018, Zanardi sent another email to FreeFlight decrying that "Carlos is running around Florida Airport Council talking with our clients … stating he can 100% support VMAT 1.0."

90.     Zanardi continued to pressure FreeFlight to terminate VMAT Support Services Certification agreement with INDMEX, based on the false premise that Harris had an exclusive right to provide those services.

91.     In furtherance of their violations of the antitrust laws, Zanardi and L3Harris made false claims to both FreeFlight, Airports, and ANSPs.

92.     For example, on July 26, 2018, Zanardi sent an email to Ring stating: "*We just submitted a renewal bid for VMAT maintenance at both ATL [Atlanta] and DEN [Denver] and there is a significant chance that Carlos [principal of INDMEX] has bid his services there claiming who knows what. In our proposals we have explicitly stated that we are the exclusive VMAT 1.0 hardware service supplier to those airports*."

93.     Notably, at this juncture, L3Harris was simply not the "*exclusive VMAT 1.0 hardware service supplier to those airports*."

94.     Over the next two months, Zanardi continued to demand that FreeFlight draft a written notice terminating INDMEX's VMAT Support Services Certification.

95.     For example, on August 22, 2018, Zanardi stated to Ring that: "… *It is our understanding that IndMex is still promoting that they can provide hardware support service for VMAT 1.0. We are working on renewing Massport for VMAT support, and having Carlos come in there to say he can provide VMAT 1.0 support is again hurting us. Can you please confirm that you have communicated to Carlos that he cannot provide VMAT 1.0 hardware support per our SPA*."

96.     On that same email, Zanardi stated to Ring that: "… *I am open to extending the VMAT 1.0 SPA into CY19 with a level of minimum purchase, but I will need a commitment from FFS that they will close the loop on the VMAT 1.0 maintenance dance you guys are doing with INDMEX and any other 3rd Party*."

97.     Zanardi and L3Harris anticipated a "*mutual beneficial partnership*" with FreeFlight for exclusivity on the support and maintenance of the VMAT Units at the expense of INDMEX and any other third-party.

98.     On August 28, 2018, Zanardi followed up with Ring to terminate INDMEX's service role by confirming that Harris was the sole provider: "… *friendly reminder to please send me formal written confirmation that Harris is the exclusive VMAT 1.0 Hardware, Supplier and Maintenance provider to U.S. Airports per the terms of the SPA*."

99.     On September 4, 2018, Zanardi emailed Ring stating: "*Just want to check on the status of the written confirmation. Carlos attended the Pre-Proposal Briefing at Massport*[7] *last Tuesday so I'm not clear on what his intention currently is or what has been communicated to him. As I am sure you can understand, we want to provide full clarity in our RFP response*."

100.    On September 10, 2018, Ring emailed Zanardi stating: "*Does your legal team have a template that they would prefer for this?  It may make the most sense for them to draft the document and I can endorse it on FFS letter head. That way it covers everything it needs… I know you can't commit to specific quantities that far into the future, but perhaps an exclusive multi-year agreement with minimum quantities to be added on an annual basis*."

101.    On September 11, 2018 (6:01 AM), prior to providing the requested draft, Zanardi emailed Ring stating: "*I will work with Legal to get the language for the document ASAP to ensure it covers everything it needs to. Please know we would like this turned around this week as Massport is due in the next couple of weeks and we need to submit it to them well in advance so that [we] can inform potential bidders.*"

102.    Later that day (at 6:06 PM), Zanardi emailed Ring a draft of the requested letter, which was wholly adopted by FreeFlight on September 14, 2018, as fully discussed *infra*.

---

[7]     "Massport" refers to the ANSP for Logan Airport in Boston which was putting a contract out to bid in fall 2018 for ground safety solutions.

103.    As a result of the letter and because MASSPORT had made the support of the VMAT 1.0 a mandatory requirement in that procurement, MASSPORT did not receive any other bids for these services. L3Harris effectively pushed out all other competitors, not just INDMEX, from this major procurement by MASSPORT.

104.    On September 14, 2018, after repeated requests by Zanardi and L3Harris, FreeFlight finally published the requested letter (drafted by Harris), which unequivocally stated that L3Harris was the exclusive authorized provider of sales and support of the VMAT 1.0 Units. Attached hereto as Exhibit G is the September 14, 2018 letter (the "Termination Letter").

105.    In doing so, and as a direct result of Defendant's actions, FreeFlight unilaterally revoked INDMEX's status as an authorized provider of the VMAT Support Services.

106.    The Termination Letter rendered INDMEX unable to provide the VMAT Support Services necessary to pursue the bids it had *already* made to the City of Atlanta Department of Aviation and Denver International Airport, as well as services for future bids in cities like Boston or over 20 of the nation's busiest airports using the VMAT 1.0.

107.    As a result, INDMEX was eliminated from consideration as a bidder for both contracts by the ANSPs and future prospective contracts.

108.    As evidenced through the actions of Zanardi, one of L3Harris's key goal was to cut INDMEX and any other third-party off from making bids and providing RFPs to Airports and ANSPs by stating that L3Harris was the exclusive provider of the VMAT 1.0 and its corresponding services and maintenance.

109.    The sole purpose of Zanardi's contacts with FreeFlight during this time was to terminate INDMEX's service agreement with FreeFlight and, therefore, maintain the monopoly of L3Harris amongst the Airports and ANSP's and within the airport ground safety industry.

110.    The aforementioned allegations are proven by L3Harris's own admissions via email with FreeFlight. Attached hereto as Exhibit H is a correspondence between FreeFlight and L3Harris (FreeFlight's writing is in black font and L3Harris's writing is in light blue font and highlighted for convenience).

111.    For example: L3Harris stated to FreeFlight: *"[w]e respectfully request that you instruct Team Eagle and any other distributor not to contact any of the above cited airports as that would significantly negatively impact our sole source justification. In addition if the updated April Advisory Circular comes out and lists anybody but Harris as the sole provider of an approved system then that would create all types of problems in justifying a sole source on any of the projects listed above."* Exh. H at 1.

112.    In response to FreeFlight's statement: *"[w]e have instructed our third party V-MAT 2.0 partners to not present the system to any airport customer until we have reached a consensus with Harris on the path forward. The press release from Team Eagle was in the pipeline before this discussion started. We have also asked them to not promote the system to the FAA[,]"* L3Harris responded:

> That is much appreciated. <u>I cannot overemphasize the following enough</u> – on all of our airport contracts to date that if there was another vendor of an FAA approved, ADS-B compliant unit then every one of those airports would have had to have gone out to bid on all the VMAT projects versus a sole source to Exelis/Harris. This has significantly reduced the sales cycle timeline for the VMAT projects. However, if you have two distributors of an FAA ADS-B compliant unit like Harris and Team Eagle in the market (whether it is Version 1.0 or 2.0), then the airport will have to go to competitive bid. This will extend the sales cycle on any VMAT project by at least 6-12 months at an airport. Thus, having two distributors of the only FAA certified VMAT units will do more harm to FFS versus good in terms of increasing the pace and number of sales for the VMAT units. In addition, if Harris does not maintain our exclusivity for ADS-B compliant units, we cannot continue with the minimum

purchase schedule as the sales cycle timeline would be extended quite a bit and I could no longer justify it to management.

*Id*. (emphasis in original)

113.    In short, L3Harris suppressed its competition by utilizing the power of a common supplier–FreeFlight–and induced FreeFlight to choke off aggressive competitors, *e.g*., INDMEX and Team Eagle, at L3Harris's level, so L3Harris could effectively destroy its competition, have a smooth pipe line, and monopolize the relevant market (from its 99.9% market share to 100%).

114.    Due to the mutual benefit of both FreeFlight and L3Harris and at L3Harris's insistence, FreeFlight acquiesced, harming competition in the relevant market by effectively destroying it, as fully discussed *infra*.

**B.    L3Harris Becomes Exclusive Provider of VMAT Support Services**.

115.    The Termination Letter was the first step of a series of actions taken by Zanardi and L3Harris to destroy and sabotage INDMEX and like competitors in the marketplace.

116.    Once INDMEX was no longer able to provide Support Services, the next step was for L3Harris to sign a new Strategic Purchase Agreement with FreeFlight to exclusively provide support services going forward.

117.    In other words, FreeFlight's signing and publishing of the Termination Letter (drafted by L3Harris) was a *quid pro quo* for L3Harris entering into a new Strategic Purchase Agreement with FreeFlight which locked up the market.

118.    On January 11, 2019, FreeFlight and L3Harris entered into a new Strategic Purchase Agreement (the "2019 L3Harris SPA"), whereby L3Harris ███████████████████ ██████████████████████████████████████. Attached hereto as Exhibit I is the 2019 L3Harris SPA.

119.   The 2019 L3Harris SPA was intended to last through December 31, 2021, therefore guaranteeing a steady flow of business for FreeFlight and L3Harris. Exh. I at 1.

120.   The 2019 L3Harris SPA also finally gave L3Harris the <u>exclusive right</u> to provide hardware repair and replacement, software, and firmware updates to the VMAT 1.0 Units (the "Exclusive Right"). *Id*. Notably, the Exclusive Right had <u>not</u> been provided in the previous contract(s) between FreeFlight and L3Harris (or its predecessors); only an exclusive right to the VMAT 1.0 previously existed. *Id*.

121.   Further, the 2019 L3Harris SPA required that L3Harris ██████████████████ ████████████████████████████████████████████████████████████ " *Id*.

122.   Additionally, the 2019 L3Harris SPA set and fixed the price of the VMAT 1.0 at $4,300.00, as previously agreed between Zanardi and Ring via email, whereby L3Harris would sell the VMAT 1.0 at a "████████████" markup.

123.   By obtaining the Exclusive Right, L3Harris excluded other vendors–like INDMEX–from bidding on Airport and ANSP contracts, which required Support Services for all existing VMAT Units.

**C.    <u>L3Harris's Actions Excluded INDMEX from the Relevant Market</u>.**

124.   L3Harris tortiously interfered with INDMEX's business expectancies and its ability to provide the VMAT Support Services to Airports and ANSPs.

125.   At all relevant times, L3Harris was aware of the VMAT Support Services Certification granted to INDMEX by FreeFlight.

126.   At all relevant times, L3Harris intentionally and willfully, pursued all possible measures to have INDMEX's right to the VMAT Support Services terminated.

127.    At all relevant times, L3Harris intentionally and willfully threatened FreeFlight and stated that it would no longer conduct business with FreeFlight unless FreeFlight terminated INDMEX's right to perform VMAT Support Services.

128.    As a result of L3Harris's actions, INDMEX lost out on business opportunities in connection with its right to provide VMAT Support Services.

129.    For example, on June 20, 2018, Denver International Airport published a Request for Proposal for ADS-B software and support services (the "DEN RFP")—*i.e.* the same services that INDMEX was certified to perform.

130.    On July 10, 2018, INDMEX submitted its proposal under the Denver RFP.

131.    On September 28, 2018, INDMEX was invited for a selection interview. This September 28, 2018 invitation letter is attached hereto as Exhibit J.

132.    However, as of October 1, 2018, INDMEX could no longer perform the VMAT related services in its submitted proposal because of the Termination Letter from FreeFlight—as orchestrated by L3Harris.

133.    On November 8, 2018 Denver International Airport informed INDMEX that as a result of its inability to provides VMAT 1.0 services, it had selected another vendor for delivery of VMAT and unrelated software display and runway incursion products.

134.    Likewise, on June 6, 2018, Hartsfield-Jackson Atlanta International Airport ("ATL") published a similar Request for Proposal regarding ADS-B software and support services (the "ATL RFP").

135.    On June 17, 2018, INDMEX submitted its proposal under the ATL RFP.

136.    On September 24, 2018, ATL independently raised the issue of the Termination Letter and its relationship to INDMEX's ability to provide the VMAT Support Services.

137.    As of October 1, 2018, INDMEX also could no longer perform the services in its submitted proposal because of the Termination Letter from FreeFlight—as orchestrated by L3Harris.

138.    Notably, L3Harris needed the Termination Letter to be issued industry-wide as soon as possible as it wanted to pursue a similar procurement request at Boston Logan International Airport – Massport ("Boston RFP").  *See supra.*

139.    INDMEX would have also pursued the Boston RFP but for L3Harris's actions in having the Termination Letter issued and circulated amongst the ANSP market.

140.    As a result of the above actions, L3Harris attempted to and was successful in excluding INDMEX from the relevant market and monopolizing the relevant market for providing VMAT Support Services to major airports and ANSP's in the United States.  The next step of L3Harris was to freeze out INDMEX from <u>any</u> access to the VMAT products.

**D.    L3Harris Pressures FreeFlight to Suspend Production of VMAT 2.0 for Anti-Competitive Reasons in violation of the Antitrust Laws**.

**i.    L3Harris's goal was to obtain sole-source justification to evade FAA procurement guidelines for bidding on contracts to supply VMAT Units and Support Services in the relevant market**.

141.    Within the Federal contracting space, sole- source contracts can be used when only one contractor is capable of delivering the goods or services needed and, therefore, it is not feasible to solicit or obtain competitive bids. *See* 2 CFR § 200.320(f).

142.    However, these types of contracts are considered high-risk and can result in wasted taxpayer resources, poor contractor results, and inadequate accountability.[8]

---

[8]    *See, e.g.,* Office of the Inspector General's Audit Report: FAA Lacks Adequate Controls to Accurately Track and Award Sole-Source Contracts, dated May 9, 2016, at 1 (https://www.oig.dot.gov/sites/default/files/FAA%20SoleSource%20Contracts_Final%20Report%5E5-9-16.pdf).

143.    Even after L3Harris was able to (tortiously) obtain the termination of INDMEX's right to perform VMAT Support Services, INDMEX still remained in competition with Harris through its ability to bid on contracts utilizing the VMAT 2.0 Unit—an updated alternative to Harris's exclusive distribution of the VMAT 1.0 Unit.

144.    Because there were two VMAT models in the marketplace, and because these are available through separate suppliers, Airports purchasing VMAT Units with FAA grant funds are required to go through an open and competitive procurement process.

145.    By having to undertake a competitive procurement process, this resulted in a delay in purchase orders for L3Harris (and FreeFlight) from airport procurement authorities, which "*extended the sales cycle*" for both L3Harris and FreeFlight.

146.    Therefore, L3Harris's next goal—after renewing its VMAT 1.0 supply agreement in January 2019 with FreeFlight—was to eliminate INDMEX as a competitor by terminating its underlying distributorship for VMAT 2.0 products.

147.    Prohibiting INDMEX from selling VMAT 2.0 Units would also result in L3Harris acquiring 'sole-source justification' and thus avoiding the Federal procurement process requiring competitive bids.

148.    This is clearly evidenced by Exhibit H to this Amended Complaint. *See* Exh. H.

149.    This became the third and ultimate step in banishing INDMEX from the marketplace and consolidating a L3Harris monopoly, notwithstanding its already significant 99% market power in the relevant market.

ii.    **INDMEX'S Miami Bid Protest Brings L3Harris Retaliation**.

150.    On October 30, 2018—i.e. shortly after INDMEX lost multiple opportunities as a result of the Termination Letter and just prior to Harris entering the 2019 L3Harris SPA—Zanardi

contacted VP Ring of FreeFlight, complaining that INDMEX's conduct was "*delaying*" the purchase of ███████ by Miami International Airport: "*Miami is a* ███████ *to you guys that is being held up for this Qtr because of Carlos's actions. If Carlos continues these tactics, there is very little benefit to FFS as all it will do is delay orders. I am concerned with him trying to do the same thing at MWAA (as we are expecting the PO any day now for* ███ *and* ███ *– please keep confidential)*."

151.    On October 31, 2018, Zanardi emailed Ring requesting help from FreeFlight because INDMEX was protesting the MIA contract: "*It appears that Carlos is now protesting our contract with MIA and delaying the PO to us from them for* ███████. *We were successful in getting VMAT 1.0 spec'd in there and now this?? Please not that our plan was to order an additional* ███████ *beyond the Q4 minimum for MIA. This is hurting our business. Please let me know what FFS can do to help us out here.*"

152.    In direct response to those emails, VP Ring stated that FreeFlight's CEO was meeting with our "*legal team" for a "legal resolution with Carlos*."

153.    The "actions" Zanardi was complaining of was INDMEX's successful protest of Miami Airport's procurement going forward as a "sole source" procurement, i.e. that only L3Harris was permitted to bid on it.

154.    In response to this protest, the Dade County Procurement office, responsible for Miami International Airport, sought guidance from the FAA. That protest was supported by the FAA, as there was no showing that VMAT 2.0—*i.e.* the product INDMEX could sell—was technically inequivalent to the VMAT 1.0 and a directly option for procurement unsuited to the task.

155.    On November 1, 2018, Zanardi expanded in another email to Ring that INDMEX might also challenge the "sole source" claim for other airports: "*Because of Carlos' protest actions, it now appears that the MIA ADO is requiring that the MIA project go through bid which will likely extend the sales cycle an additional 6+ months. We were expecting the* ███████ *this week from MIA. We also have concerns that Carlos may also be trying to pull this at MWAA, where we are awaiting* ████████████████ *... again, potentially hurting our business.*"

156.    On November 3, 2018, Zanardi sent an email to the CEO of FreeFlight, Tim Taylor ("CEO Taylor"), in which he suggested "*3 solutions*" to the Miami situation.

    **i.**    FreeFlight tells MIA that it will not bid [or supply] "VMAT 2.0";

    **ii.**    FreeFlight tells MIA that no other vendors are "*authorized*" to bid MIA; and

    **iii.**    INDMEX agrees to rescind its protest "*given the recently identified limitations*[.]"

157.    CEO Taylor and Zanardi then agreed to speak the next day (November 4, 2018). Upon information and belief, they agreed on a strategy to permanently eliminate INDMEX from the VMAT market—by permanently eliminating FreeFlight's latest generation product, the VMAT 2.0 which INDMEX had access to purchase and re-sell.

    **iii.    Under Pressure from L3Harris, FreeFlight Stops Producing the "VMAT 2.0" Unit**.

158.    On November 9, 2018, INDMEX's CEO Carlos Nevarez sent FreeFlight a letter regarding the performance of VMAT 2.0 Units at ATL and asking for help to "*resolve [a] technical issue.*"

159.    On November 12, 2018, pursuant to the SPA, INDMEX submitted a Warranty Claim Report to Free Flight (the "Report") to fix those technical defects.

160.    On November 16, 2018, in an internal email, FreeFlight stated that it was "*working without outside counsel to prepare a response and nobody communicates with INDMEX …*"

161.    On November 29, FreeFlight told INDMEX it would no longer make the VMAT 2.0 Unit available unless it acquiesced to five (5) conditions, none of which were part of the SPA or otherwise required under the terms of the SPA.

162.    On December 7, 2018, prior to receiving a response from INDMEX to its November 29 letter, FreeFlight issued a letter to L3Harris, c/o Zanardi, stating that it had ceased production of the VMAT 2.0.

163.    On December 10, 2018, Rick Martin of L3Harris sent an email to the Miami Airport authorities regarding the impending termination of VMAT 2.0 ("*VMAT 1.0 which we are planning to deploy ... is now the only FAA approved VMAT unit*").  As a direct result, he asked Miami for a "*sole source purchase through [L3]Harris*" so as to expedite the inventory sales.

164.    Word of VMAT 2.0's discontinuation spread through the market.

165.    On January 15, 2019, in response to a question from MWAA, FreeFlight stated that the "2.0" was being discontinued "*as a strategic corporate decision*."

166.    On February 22, 2019, two days after directly speaking with Carlos Nevarez, CEO Taylor confirmed via letter that FreeFlight would no longer manufacture the VMAT 2.0 for INDMEX or any other distributors.  Attached hereto as Exhibit K is the February 22, 2019 letter from FreeFlight.

167.    That decision left L3Harris as the only viable option for VMAT Units (and Support Services), which were (and are) a prerequisite for bidding on airport ground safety operations.

168.    The decision to stop producing VMAT 2.0–an alternative for the VMAT 1.0–was orchestrated entirely by L3Harris in order to discourage competition so that L3Harris could enjoy

the pricing benefits of "sole source" contracting.  In effect, it convinced FreeFlight to follow the plan laid out in the November 3, 2018 memo from Zanardi.

169.    After the termination of the VMAT 2.0, Ring stated to Zanardi via e-mail that the INDMEX "matter" had been handled.

170.    As a result, L3Harris now has a market monopoly on both the VMAT Support Services market and the VMAT Units, thereby increasing its profitability (and increasing the cost of the U.S. taxpayer) as there is no longer a viable competitor.

171.    Even after the introduction of a new VMAT unit by a FreeFlight competitor, uAvionix Corporation, L3Harris negotiated exclusive rights to that unit as well, continuing their monopoly in the market.

172.    On March 17, 2019, Zanardi emailed Ring stating: "*Per our recent discussions, Harris recommends that FreeFlight Systems (FFS) continue to provide exclusivity on VMAT 1.0 in the airport market for the following reasons*":

> *8.  In return for continued exclusivity for the airport market, Harris is willing to work with other 3rd Party vendors in having them purchase the units through Harris as the primary distributor versus FFS. In such cases, Harris would only mark up the* ▮▮▮▮ *unit by* ▮▮▮▮▮▮▮▮▮▮ *to those 3rd parties so that they would have a sizable profit margin if they charged current market prices. Providing Harris this distributor role, would keep things simple for FFS (one vendor to work with), support continued minimum purchases, ensure continued* ▮▮▮▮▮▮▮▮▮▮▮ *and minimize confusion in the market place.*

173.    In essence, the actions of L3Harris amounted to violations of the antitrust laws, particularly sections 1 and 2 of the Sherman Antitrust Act, as it resulted in (i) exclusive dealing, (ii) exclusionary conduct, (iii) price-fixing, (iv) rigging the FAA procurement process through an orchestrated "sole-source" justification, (v) tying and reverse-tying, (vi) monopolization, and/or (vii) attempted monopolization.

### iv. Defendant's Tortious Interference Results in Exclusionary Conduct.

174. L3Harris tortiously interfered with INDMEX's business expectancies and prospective business expectancies related to providing VMAT Support Services.

175. L3Harris's motive was to drive INDMEX out of 'its' market, i.e. airport ground safety, and destroy its competition.

176. To that end, L3Harris threatened FreeFlight with legal action, with no legal justification, unless FreeFlight terminated INDMEX's VMAT 2.0 Support Services.

177. Upon information and belief, L3Harris threatened FreeFlight with legal action unless it also terminated the SPA and discontinued manufacturing the VMAT 2.0 Unit.

178. Through it all, L3Harris had exclusive access to the competing—and less sophisticated—VMAT 1.0 Unit.

179. In this manner, L3Harris became the sole source for Airport and ANSPs for providing VMAT Units and Support Services.

180. As a result, Harris no longer had to place bids and go through the FAA's procurement process with Airports and ANSPs.

181. By eliminating INDMEX from the relevant market for both the VMAT Support Services and VMAT units, Defendant attempted to monopolize and/or monopolized the United States marketplace for ADS-B compliant airport ground vehicle movement area transponders (a.k.a. VMAT Units) and the servicing thereof.

182. By eliminating INDMEX from the market for both the VMAT Support Services and being able to sell the VMAT 2.0 Unit, Defendant engaged in illegal exclusionary conduct in violation of antitrust laws.

183.    As a result of Defendant's tortious interference and illegal conduct, Defendant sabotaged INDMEX, while attempting to monopolize and/or monopolize in the relevant market.

184.    The actions by Defendant were willful and wanton and taken with reckless disregard for the welfare of INDMEX.  Indeed, they were taken with the specific object of destroying INDMEX and its business relationships, and to destroy competition in the relevant market.

### IV.    L3HARRIS'S MARKET POWER IN THE RELEVANT MARKET.

185.    At the relevant times of the alleged events, between INDMEX, Team Eagle, and L3Harris, L3Harris obtained and maintained a 99% market share in this relevant market, which stifled and destroyed competition in the relevant market in violation of the antitrust laws.

186.    More specifically, at the relevant times of the alleged events–as of October 5, 2018– L3Harris had ███████ Units deployed in airports in the United States and expected another ███ VMAT Units to be deployed based on orders expected in quarter four (Q4) of 2018. Attached hereto as Exhibit L is an email from Christopher Zanardi from L3Harris to Peter Ring at FreeFlight regarding L3Harris's airport customers and L3Harris's lists of airport customers where VMAT Units were deployed.

187.    During this same time frame, INDMEX had only 14 VMAT 2.0 deployed to airports in the United States.

188.    Upon information and belief, Team Eagle had 0-14 VMAT 2.0 deployed to airports in the United States.

189.    The relevant market has a high barrier to entry, as only a few companies in the United States had access to the VMAT Units and Support Services, and requires the use of sophisticated hardware and software.

36

190.   The relevant market is highly concentrated in that the total market share is locked up by a few number of firms, with L3Harris having 99% market share.

191.   Taking into account INDMEX's, L3Harris's, and Team Eagle's market share in the relevant market, L3Harris, at all relevant times, had, maintained, and operated as the dominant company in the relevant market such that L3Harris's 99% market share is sufficient to constitute monopoly power in the relevant market.

192.   Because L3Harris controls at least seventy to seventy-five of the relevant market, L3Harris has the requisite predominance for supporting a finding of monopoly power.

193.   L3Harris's market share of over 90% is sufficient to constitute monopoly power.

## COUNT I
### Violations of Sherman Act 15 U.S.C. § 1

194.   INDMEX hereby incorporates the paragraphs alleged above by reference as if fully alleged herein.

195.   The Sherman Act outlaws "every contract, combination, or conspiracy in restraint of trade," and any "monopolization, attempted monopolization, or conspiracy or combination to monopolize." 15 U.S.C. §§ 1, 2.

196.   "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States…" 15 U.S.C. § 15(a).

197.   As alleged in this complaint and based on L3Harris's and FreeFlight's own statements and admissions, all restraints referenced herein were horizontal in nature as the actions of FreeFlight were taken at the direction of L3Harris. The restraints referenced herein are horizontal in nature because L3Harris suppressed its competition by utilizing the power of a common supplier–FreeFlight–and induced FreeFlight to choke off aggressive competitors like

INDMEX at L3Harris's level, so L3Harris could effectively destroy its competition, have a smooth pipe line, and monopolize the relevant market (from its 99.9% market share to 100%). Therefore, the desired impact is horizontal and on the dealer, not the manufacturer, level.

198.    L3Harris's conduct violates the Sherman Act, 15 U.S.C. § 1, because L3Harris entered into an agreement, namely the 2019 L3Harris SPA, to allocate the entire relevant market to L3Harris, and excluded and foreclosed competitors, including Plaintiff INDMEX from competing in the relevant market.

199.    For example, L3Harris engaged in illegal exclusionary conduct by intentionally excluding INDMEX–its competitor–from the ability to compete in the relevant market, by (i) tortuously interfering with INDMEX's Support Services and the Certification, (ii) making false statements to FreeFlight, Airports, and ANSPs regarding INDMEX's ability to compete in said markets and provide VMAT Support Services, (iii) engaging with FreeFlight to have an exclusive agreement for the VMAT Units and their Support Services, and (iv) entering into the 2019 L3Harris SPA, thereby eliminating, excluding, and foreclosing INDMEX from the VMAT Support Services market.

200.    Further, upon information and belief, L3Harris engaged in further exclusionary conduct in that it reached a back-room deal with FreeFlight, in furtherance of entering into the 2019 L3Harris SPA, to have the VMAT 2.0 discontinued so that L3Harris could orchestrate a "sole-source" justification for its bids with Airports and ANSPs for VMAT Units and Support Services to circumvent the federal procurement guidelines, as required by 49 C.F.R., Part 18 and 2 C.F.R., Part 200, and the FAA's procurement guidelines. This in turn allowed L3Harris to make additional purchase orders from FreeFlight, without having to go through the FAA's bidding processing, and win contracts with Airports while eliminating INDMEX from being able to pursue

the same.  As a result of L3Harris's actions, INDMEX was also eliminated, excluded, and foreclosed from competing with L3Harris in the VMAT Units market.

201.    The aforementioned conduct by L3Harris also resulted in all bids for VMAT Units and Support Services through the FAA's procurement process with Airports being rigged in that, through the discontinuance of the VMAT 2.0 and L3Harris's false statements to Airports and ANSPs regarding INDMEX's inability to provide Support Services for the VMAT Units as a result of L3Harris' purported exclusivity, L3Harris was able to make bids with Airports on a "sole-source" justification.  This is a *per se* violation of the antitrust laws.

202.    Further, L3Harris engaged in an illegal resale price maintenance agreement and/or illegal price-fixing in that it agreed that it would sell FreeFlight's VMAT 1.0 to "*vendors*" (i.e. ANSPs) for "███████████" above its cost of "█████[.]" L3Harris's intentions were manifested in the 2019 L3Harris SPA. *See* Exh. I. Also, this constitutes an illegal market allocation agreement in that L3Harris, being the exclusive provider of the VMAT 1.0 (with the discontinuance of the VMAT 2.0), is now allocated the entire market for the VMAT Units and Support Services without the need for FreeFlight to resort to any other third-parties, like INDMEX, to sell its VMAT Units and provide VMAT Support Services.  Even if considered a vertical restraint here, under well-settled caselaw, a vertical restraint is illegal *per se* if it involves some agreement on price or price levels, like here.

203.    L3Harris engaged in illegal exclusive dealing by entering into the 2019 L3Harris SPA, as alleged above, which, coupled with the discontinuance of the VMAT 2.0, granted L3Harris *exclusivity* to the VMAT Units (namely, the remaining VMAT 1.0) and Support Services. L3Harris thereafter entered into an exclusive deal with uAvionix Corporation for an exclusive right to a new VMAT unit as well, continuing their exclusive dealing in the market.

204.   L3Harris also engaged in a commercially motivated group boycott against INDMEX. L3Harris has a substantial market power and horizontal control over essential resources in the relevant market, i.e., the VMAT Units and Support Services. As part of L3Harris's agreement and violation of the antitrust laws, L3Harris communicated with third parties that do business with INDMEX or might do business with INDMEX, and convinced them, through false statements, not to do business with INDMEX. L3Harris's conduct harmed INDMEX because INDMEX's inability to do business with third-parties, such as FreeFlight, Airports, and ANSPs, for example, makes it impossible to compete with L3Harris in the relevant market.

205.   Additionally, L3Harris engaged in reverse-tying in that—under the 2019 L3Harris SPA and, upon information and belief, the aforementioned back-room deal to discontinue the VMAT 2.0—L3Harris agreed to purchase a set number of VMAT 1.0 per quarter, at a set-price, from FreeFlight only on the condition that FreeFlight refused to sell the VMAT 2.0 and refused to grant the right to the VMAT 1.0 and VMAT Support Services to anyone other than L3Harris.

206.   L3Harris also engaged in tying in that the 2019 L3Harris SPA required that, in consideration for L3Harris receiving the Exclusive Rights to the VMAT 1.0 and the Support Services for the VMAT 1.0 from FreeFlight, L3Harris "███████████████████████████████ ███████████████████████████████████████" *See* Exh. I. In other words, L3Harris agreed that it would have exclusive rights to the VMAT 1.0 at a set-price, requiring a minimum order of ██████ per calendar quarter, and the Support Services thereto, while maintaining exclusivity for certain airports only if L3Harris did not replace the VMAT 1.0 with its own or a 3rd party's product. *See id.* In fact, these very terms were negotiated at length at L3Harris's own insistence. *See* Exh. L at 1.

207.     Upon information and belief, L3Harris also engaged tying by (i) tying its VMAT 1.0 to its VMAT Support Services and vice-versa with Airports, ANSPs, and other third-party vendors, and (ii) tying the VMAT 1.0 to other ancillary services and vice-versa with Airports, ANSPs, and other third-party vendors. In essence, L3Harris conditioned the sale of VMAT 1.0 on purchaser's agreement to also purchase other products and service from L3Harris and also conditioned the sale of its VMAT Support Services to other products and services including, but not limited to, the VMAT 1.0.

208.     The requisite intent of L3Harris is illustrated by its willful acquisition of power, through their tortious conduct, which it consciously pursued, attained, and then maintained.

209.     L3Harris's conduct is a *per se* violation of Section 1 of the Sherman Act because it involves a horizontal agreement among competitors to allocate markets and exclude competitors, including Plaintiff, from the relevant market.

210.     L3Harris's conduct is a *per se* violation of Section 1 of the Sherman Act because it involves price-fixing, bid-rigging, group boycotting, tying, and reverse-tying.

211.     In the alternative, L3Harris's aforementioned violations of the antitrust laws should be assessed under the rule of reason or quick-look analysis.

212.     L3Harris has sufficient market and monopoly power over the relevant market to appreciably restraint free competition in these markets. In fact, at the time of the alleged events, L3Harris maintained a 99-100% market share in the relevant market.

213.     L3Harris's conduct and agreements harm competition in the relevant market by excluding VMAT Unit vendors and Support Service providers, including INDMEX (and nonparties like Team Eagle), from competing with L3Harris. Moreover, L3Harris's conduct and

agreements discourage all VMAT Unit vendors and Support Service providers from competing within the relevant market.

214.   L3Harris's conduct and agreements have and will, as a result, increase prices and decrease the quality and quantity of the product and services in the relevant market.

215.   As a result of L3Harris's anticompetitive conduct, INDMEX has been and will continue to be injured through significant economic and financial loss, the loss of current and future business, and reputational damage. Thus, INDMEX has suffered antitrust injury from L3Harris' anticompetitive conduct, which has harmed both competition in the relevant market and INDMEX.

216.   L3Harris's conduct and agreements was intended to and did substantially harm and affect a substantial amount of interstate commerce.

217.   L3Harris's conduct and agreements do not qualify for immunity, nor are they reasonably related to any efficiencies or other benefits sufficient to justify their harmful effects on competition in the relevant market. The anticompetitive harm from L3Harris's conduct and agreements substantially outweigh the non-existent efficiency and competitive benefits.

218.   As a result of L3Harris's violation of the antitrust laws, as aforementioned, INDMEX has been suffered antitrust injury and damages for an amount not less than $3,300,000.00.

219.   INDMEX is entitled to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for an amount not less than $9,900,000.00, to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, its reasonable attorneys' fees, simple interest on actual damages, and a constructive trust on any profits derived therefrom by L3Harris.

**COUNT II**
**Violations of Sherman Act 15 U.S.C. § 2**

220.     INDMEX hereby incorporates the paragraphs alleged above by reference as if fully alleged herein.

221.     L3Harris attempted to monopolize or did actually monopolize the relevant market in violation of 15 USC § 2.

222.     At all relevant times hereto, L3Harris possessed monopoly power and/or attempted to monopolize in the relevant market.

223.     At all relevant times hereto, L3Harris had the power to control prices and exclude competition in the relevant market.

224.     At all relevant times hereto, L3Harris acted with the intent to attempt to monopolize and/or monopolize in the relevant market.

225.     At all relevant times hereto, L3Harris had at least seventy to seventy-five percent market share in the relevant market.

226.     At all relevant times hereto, L3harris had a 99% market share in the relevant market and has truly been predominant in the relevant market.

227.     At all relevant times hereto, L3Harris had significant ability to control the relevant market, a 99% market share, the ability to control prices, and exclude competitors.

228.     Through the cancellation of the SPA, the VMAT Support Services Certification, and L3Harris' new business arrangement with FreeFlight—i.e., the 2019 L3Harris SPA—L3Harris attempted to and were able to obtain a monopoly.

229.     At all relevant times hereto, L3Harris' intent was to attempt to monopolize and destroy and exclude INDMEX from competition in the relevant market so that L3Harris could attain a monopoly in the relevant market. In addition to the natural benefits of a monopoly (e.g.

43

price setting), this monopoly also permitted L3Harris to bid on projects under a "sole source" justification.

230.    L3Harris's conduct and agreements have and will, as a result, increase prices and decrease the quality and quantity of services in the relevant market.

231.    L3Harris willfully acquired or maintained the monopoly power by engaging in conduct to foreclose competition in the relevant market, to gain a competitive advantage, and to destroy its competitors. L3Harris willfully acquired or maintained the monopoly power through the use of long-term multi-year, exclusive supply agreements for the VMAT 1.0 and Support Services, as evidenced by the 2019 L3Harris SPA, thereby foreclosing competition in the relevant market. Due to the exclusive agreement, all competitors have been foreclosed from the relevant market, which includes INDMEX and Team Eagle. Therefore, L3Harris's conduct has resulted in a 100% foreclosure of competition in the relevant market.

232.    At all relevant times hereto, as demonstrated by its own statements and admissions, L3Harris had an intent to monopolize the relevant market and had a dangerous probability of succeeding. Given the aforementioned market characteristics and the barriers to entry, and L3Harris's existing market share of 99% in the relevant market, the market has already been monopolized by L3Harris or there is a dangerous probability of L3Harris succeeding.

233.    As a result of L3Harris's anticompetitive conduct, INDMEX has been and will continue to be injured through significant economic and financial loss, the loss of current and future business, and reputational damage. Thus, INDMEX has suffered antitrust injury from L3Harris' anticompetitive conduct, which has harmed both competition in the relevant market and INDMEX.

234.    L3Harris's conduct and agreements was intended to and did substantially harm and affect a substantial amount of interstate commerce.

235.    L3Harris's conduct and agreements do not qualify for immunity, nor are they reasonably related to any efficiencies or other benefits sufficient to justify their harmful effects on competition in the relevant market. The anticompetitive harm from L3Harris's conduct and agreements substantially outweigh the non-existent efficiency and competitive benefits

236.    As a result of L3Harris's violation of the antitrust laws, as aforementioned, INDMEX has been suffered antitrust injury and damages for an amount not less than $3,300,000.00.

237.    INDMEX is entitled to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, or an amount not less than $9,900,000.00., to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, its reasonable attorneys' fees, simple interest on actual damages, and a constructive trust on any profits derived therefrom by L3Harris.

**COUNT III**
**Violation of 15 U.S.C. § 14 (Sale, etc., on agreement not to use goods of competitors)**

238.    INDMEX hereby incorporates the paragraphs alleged above.

239.    L3Harris violated Section 3 of the Clayton Act, 15 U.S.C. § 14.

240.    Section 3 of the Clayton Act prohibits: "for any person engaged in commerce . . . to lease or make a sale or contract for sale of goods . . . on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessor or seller, where the effect . . . may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14.

241.    Section 3 of the Clayton Act only covers goods, like that of the VMAT 1.0 and VMAT 2.0, such that it is applicable here.

242.    The gravamen of a Section 3 violation is the forbidden condition, ***agreement*** or understanding of exclusivity, like the 2019 L3Harris SPA.

45

243.    Because there is a valid and existing agreement–*i.e.*, the 2019 L3Harris SPA–for the goods (the VMAT Units) at issue here, Section 3 of the Clayton Act is applicable here.

244.    L3Harris violated Section 3 of the Clayton Act in that the 2019 L3Harris SPA required that, in consideration for L3Harris receiving the Exclusive Rights to the VMAT 1.0 and the Support Services for the VMAT 1.0 from FreeFlight, L3Harris "████████████

███████████████████████████████████████████████" *See* Exh. I.

245.    The 2019 L3Harris SPA is an exclusive dealing agreement because L3Harris agreed that it would have exclusive rights to the VMAT 1.0 at a set-price, requiring a minimum order of ██████ per calendar quarter, and the Support Services thereto, while maintaining exclusivity for certain airports ███████████████████████████

██████ *See id.* In fact, these very terms were negotiated at length at L3Harris's own insistence. *See* Exh. L at 1.

246.    The aforementioned exclusive dealing agreement is prohibited because the arrangement foreclosed competition in a substantial share of the affected line of commerce in the relevant market. Although L3Harris had a 99% market in the relevant market, by entering into the 2019 L3Harris SPA and obtaining the exclusive rights to both the VMAT 1.0 (the only remaining VMAT Unit) and the Support Services thereto, the arrangement foreclosed competition in a substantial share of the affected line of commerce in the relevant market.

247.    Further, the 2019 L3Harris SPA is an unlawful tying agreement in that the 2019 L3Harris SPA required that, in consideration for L3Harris receiving the Exclusive Rights to the VMAT 1.0 and the Support Services for the VMAT 1.0 from FreeFlight, L3Harris "████████

████████████████████████████████████████

████ " *See* Exh. I.

248.    Because L3Harris enjoyed a monopolistic position in the relevant market, as alleged above, for the tying product, the aforementioned tying agreement violates the narrower standards expressed in § 3 of the Clayton Act because the requisite potential lessening of competition is inferred in the relevant market.

249.    Because L3Harris, through the 2019 L3Harris SPA, substantially restrained the volume of commerce in the tied product, the aforementioned tying agreement violates the narrower standards expressed in § 3 of the Clayton Act because the requisite potential lessening of competition is inferred in the relevant market.

250.    The aforementioned tying agreement has no other purpose than the suppression of competition.

251.    L3Harris's successful imposition of the tying arrangement aforementioned is on a substantial amount of commerce, as it is essentially the only competitor in the relevant market, and this may be taken as proof of its economic power over the tying product, such that the Clayton Act does not require a separate showing of economic dominance because the tying arrangement here affects sufficient commerce.

252.    L3Harris's conduct and agreements have and will, as a result, increase prices and decrease the quality and quantity of the product and services in the relevant market.

253.    As a result of L3Harris's anticompetitive conduct, INDMEX has been and will continue to be injured through significant economic and financial loss, the loss of current and future business, and reputational damage. Thus, INDMEX has suffered antitrust injury from

L3Harris' anticompetitive conduct, which has harmed both competition in the relevant market and INDMEX.

254.    L3Harris's conduct and agreements was intended to and did substantially harm and affect a substantial amount of interstate commerce.

255.    L3Harris's conduct and agreements do not qualify for immunity, nor are they reasonably related to any efficiencies or other benefits sufficient to justify their harmful effects on competition in the relevant market. The anticompetitive harm from L3Harris's conduct and agreements substantially outweigh the non-existent efficiency and competitive benefits.

256.    As a result of L3Harris's violation of the antitrust laws, as aforementioned, INDMEX has been suffered antitrust injury and damages for an amount not less than $3,300,000.00.

257.    INDMEX is entitled to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for an amount not less than $9,900,000.00, to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, its reasonable attorneys' fees, simple interest on actual damages, and a constructive trust on any profits derived therefrom by L3Harris.

## COUNT IV
### Tortious Interference with Contract

258.    INDMEX hereby incorporates the paragraphs alleged above.

259.    INDMEX had a valid contractual relationship with FreeFlight, as memorialized in the SPA and the VMAT Support Services Certification.

260.    At all relevant times, L3Harris had both actual and constructive knowledge of the contractual relationship between INDMEX and FreeFlight, as memorialized in the INDMEX SPA and the VMAT Support Services Certification.

261.    At all relevant times, the INDMEX SPA and the VMAT Support Services Certification were valid and binding contracts. Pursuant to these contracts, INDMEX purchased and sold fourteen (14) VMAT Units and provided Support Services for the VMAT Units in the relevant market.

262.    L3Harris's intent to tortiously interference with the INDMEX SPA and the VMAT Support Services Certification is evidenced by its aforementioned statements and admission and those attached to this Amended Complaint. For example, as stated by L3Harris:

> That is much appreciated. <u>I cannot overemphasize the following enough</u> – on all of our airport contracts to date that if there was another vendor of an FAA approved, ADS-B compliant unit then every one of those airports would have had to have gone out to bid on all the VMAT projects versus a sole source to Exelis/Harris. This has significantly reduced the sales cycle timeline for the VMAT projects. However, if you have two distributors of an FAA ADS-B compliant unit like Harris and Team Eagle in the market (whether it is Version 1.0 or 2.0), then the airport will have to go to competitive bid. This will extend the sales cycle on any VMAT project by at least 6-12 months at an airport. Thus, having two distributors of the only FAA certified VMAT units will do more harm to FFS versus good in terms of increasing the pace and number of sales for the VMAT units. In addition, if Harris does not maintain our exclusivity for ADS-B compliant units, we cannot continue with the minimum purchase schedule as the sales cycle timeline would be extended quite a bit and I could no longer justify it to management.

Exh. H at 1 (emphasis in original)

263.    In short, L3Harris suppressed its competition by utilizing the power of a common supplier–FreeFlight–and induced FreeFlight to choke off aggressive competitors, *e.g.*, INDMEX and Team Eagle, at L3Harris's level, so L3Harris could effectively destroy its competition, have a smooth pipeline, and monopolize the relevant market (from its 99.9% market share to 100%).

264.    Due to the mutual benefit of both FreeFlight and L3Harris and at L3Harris's insistence, FreeFlight acquiesced, harming competition in the relevant market by effectively

destroying it by effectively granting L3Harris an exclusive right to both the VMAT 1.0 and the Support Services thereto, while removing the VMAT 2.0 from the relevant market.

265.    As alleged above, L3Harris intentionally interfered with the INDMEX SPA and VMAT Support Services Certification, thereby inducing and/or causing a breach and/or termination of these same contractual relationship.

266.    In furtherance of their tortious interference, L3Harris utilized several improper methods including, but not limited to:

      i.      Making false statements about INDMEX and its contractual rights to provide VMAT Support Services;

      ii.     Making false statements about its own contractual rights to airport authorities or entities and other third parties;

      iii.    Retaliating against INDMEX for exercising its legal rights under INDMEX's SPA;

      iv.     Engaging in illegal exclusionary conduct in violation of antitrust laws;

      v.      Engaging in illegal exclusive dealing in violation of antitrust laws;

      vi.     Engaging in illegal group boycott in violation of antitrust laws;

      vii.    Engaging in illegal resale price maintenance agreement in violation of antitrust laws;

      viii.   Engaging in illegal tying and reverse-tying agreement in violation of antitrust laws;

      ix.     Engaging in illegal bid-rigging in violation of antitrust laws;

      x.      Engaging in illegal market allocation agreement in violation of antitrust laws;

xi.     Attempting to monopolize or monopolizing in violation of antitrust laws;

xii.    Attempting to fix prices or price-fixing in violation of antitrust laws; and

xiii.   Circumventing federal procurement and FAA guidelines and rules by misrepresenting itself as an exclusive provider of VMAT Units and Support Services in order to achieve "sole-source" contracts.

267.    As a result of L3Harris's actions, INDMEX has been actually damaged for an amount not less than $3,300,000.00.

268.    L3Harris engaged in the aforementioned tortious interference against INDMEX with actual malice or wantonness, thereby entitling INDMEX to punitive damages, pursuant to Virginia Code § 8.01-38.1, for an amount not less than $350,000.00. Accordingly, INDMEX is entitled to $3,650,000.00 for its actual and punitive damages.

### COUNT V
### Tortious Interference with Business Expectancies

269.    INDMEX hereby incorporates the paragraphs alleged above.

270.    INDMEX had a valid contractual relationship with FreeFlight, as memorialized in the SPA and the VMAT Support Services Certification.

271.    Pursuant to the VMAT Support Services Certification, INDMEX had the ability to bid on and win contracts with ANSP's and airport authorities to provide ground safety services, deploying VMAT units and providing support services for all VMAT units.

272.    At all relevant times, the INDMEX SPA and the VMAT Support Services Certification were valid and binding contracts. Pursuant to these contracts, INDMEX purchased and sold fourteen (14) VMAT Units and provided Support Services for the VMAT Units in the relevant market.

273.    L3Harris's intent to tortiously interference with the INDMEX SPA and the VMAT

Support Services Certification is evidenced by its aforementioned statements and admission and

those attached to this Amended Complaint. For example, as stated by L3Harris:

> That is much appreciated. <u>I cannot overemphasize the following</u>
> <u>enough</u> – on all of our airport contracts to date that if there was
> another vendor of an FAA approved, ADS-B compliant unit then
> every one of those airports would have had to have gone out to bid
> on all the VMAT projects versus a sole source to Exelis/Harris. This
> has significantly reduced the sales cycle timeline for the VMAT
> projects. However, if you have two distributors of an FAA ADS-B
> compliant unit like Harris and Team Eagle in the market (whether it
> is Version 1.0 or 2.0), then the airport will have to go to competitive
> bid. This will extend the sales cycle on any VMAT project by at
> least 6-12 months at an airport. Thus, having two distributors of the
> only FAA certified VMAT units will do more harm to FFS versus
> good in terms of increasing the pace and number of sales for the
> VMAT units. In addition, if Harris does not maintain our exclusivity
> for ADS-B compliant units, we cannot continue with the minimum
> purchase schedule as the sales cycle timeline would be extended
> quite a bit and I could no longer justify it to management.

Exh. H at 1 (emphasis in original)

274.    In short, L3Harris suppressed its competition by utilizing the power of a common

supplier–FreeFlight–and induced FreeFlight to choke off aggressive competitors, *e.g.*, INDMEX

and Team Eagle, at L3Harris's level, so L3Harris could effectively destroy its competition, have a

smooth pipeline, and monopolize the relevant market (from its 99.9% market share to 100%).

275.    Due to the mutual benefit of both FreeFlight and L3Harris and at L3Harris's

insistence, FreeFlight acquiesced, harming competition in the relevant market by effectively

destroying it by effectively granting L3Harris an exclusive right to both the VMAT 1.0 and the

Support Services thereto, while removing the VMAT 2.0 from the relevant market.

276.    At all relevant times, L3Harris had both actual and constructive knowledge of the

contractual relationship between INDMEX and FreeFlight, as memorialized in the SPA and the

VMAT Support Services Certification, as well as its business expectancies with ANSP's and airport authorities for airport ground services contracts.  In fact, the Defendant competed for those very same contracts.

277.    As alleged above, L3Harris intentionally interfered with the SPA and VMAT Support Services Certification, thereby inducing and/or causing a breach and/or termination of the contractual relationship between INDMEX and FreeFlight, namely the SPA and the VMAT Support Services Certification.

278.    In furtherance of their tortious interference, L3Harris utilized several improper methods including, but not limited to:

i.      Making false statements about INDMEX and its contractual rights to provide VMAT Support Services;

ii.     Making false statements about its own contractual rights to airport authorities or entities and other third parties;

iii.    Retaliating against INDMEX for exercising its legal rights under INDMEX's SPA;

iv.     Engaging in illegal exclusionary conduct in violation of antitrust laws;

v.      Engaging in illegal exclusive dealing in violation of antitrust laws;

vi.     Engaging in illegal group boycott in violation of antitrust laws;

vii.    Engaging in illegal resale price maintenance agreement in violation of antitrust laws;

viii.   Engaging in illegal tying and reverse-tying agreement in violation of antitrust laws;

ix.     Engaging in illegal bid-rigging in violation of antitrust laws;

x.      Engaging in illegal market allocation agreement in violation of antitrust laws;

xi.      Attempting to monopolize or monopolizing in violation of antitrust laws;

xii.      Attempting to fix prices or price-fixing in violation of antitrust laws; and

xiii.      Circumventing federal procurement and FAA guidelines and rules by misrepresenting itself as an exclusive provider of VMAT Units and Support Services in order to achieve "sole-source" contracts.

279.     As a result of L3Harris's actions, at a minimum, INDMEX lost out on legitimate business expectancies from no fewer than three (3) ANSP contracts in the United States, as detailed *supra*. As a result of Defendant's actions, INDMEX was also deprived of the ability to capitalize on the supplemental services and software sought by contracting Airport Procurement Authorities.

280.     As a result of L3Harris's actions, INDMEX has been damaged for an amount not less than $3,300,000.00.

281.     L3Harris engaged in the aforementioned tortious interference against INDMEX with actual malice or wantonness, thereby entitling INDMEX to punitive damages, pursuant to Virginia Code § 8.01-38.1, for an amount not less than $350,000.00. Accordingly, INDMEX is entitled to $3,650,000.00 for its actual and punitive damages.

## Prayer for Relief

WHEREFORE, Plaintiff INDMEX prays that it be entitled to the following recovery:

- Count I – Violation of Section 1 of the Sherman Act.: actual damages in the amount of $3,300,000.00 and treble damages in an amount of $9,900,000.00 against L3Harris;

- Count II – Violation of Section 2 of the Sherman Act.: actual damages in the amount of $3,300,000.00 and treble damages in an amount of $9,900,000.00 against L3Harris.

- Count III – Violation of Section 3 of the Clayton Act: actual damages in the amount of $3,300,000.00 and treble damages in an amount of $9,900,000.00 against L3Harris.

- Count IV – Tortious Interference with Contract: actual damages in the amount of $3,300,000.00 against L3Harris and punitive damages in an amount not less than $350,000.00 against L3Harris, totaling a sum of $3,650,000.00;

- Count V – Tortious Interference with Business Expectancies: actual damages in the amount of $3,300,000.00 and punitive damages in an amount not less than $350,000.00 against L3Harris, totaling a sum of $3,650,000.00;

- Punitive damages in the amount of $350,000.00;

- Attorneys' fees, court costs, and pre- and post-judgment interest; and

- Such other relief as this Court deems just and equitable including, but not limited to, simple interest on damages pursuant to 15 U.S.C. § 15(a).

## **JURY DEMAND**

INDMEX, pursuant to Rule 38 of the Federal Rules of Civil Procedure, hereby demands a trial by jury on all counts herein and all the issues so triable thereto.

Dated: September 1, 2020                           INDMEX, INC.
                                                      By Counsel

/s/ J. Chapman Petersen
J. Chapman Petersen, Esq., VSB #37225
David L. Amos, Esq., VSB #87271
Ibnul A. Khan, Esq., NY & MD*
CHAP PETERSEN & ASSOCIATES, PLC
3970 Chain Bridge Road
Fairfax, VA 22030
(571)-459-2510 – Direct Dial
(571)-459-2307 – Facsimile
jcp@petersenfirm.com
dla@petersenfirm.com
ik@petersenfirm.com
*Counsel for Plaintiff*

*Expected to Appear Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of September 2020, the foregoing document was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.


_____*/s/ J. Chapman Petersen* _____
J. Chapman Petersen